240 P.2d 1143

**ROSWELL STATE BANK v. LAWRENCE WALKER COTTON CO., Inc.**

No. 5369.

Supreme Court of New Mexico.

Feb. 14, 1952.

Garland & Sanders, Las Cruces, for appellant.

A. B. Carpenter, Roswell, for appellee.

ROGERS, District Judge.

This is an appeal from a judgment of the District Court of Chaves County, New Mexico, entered upon a verdict directed in favor of the plaintiff-appellee.

Appellee is a banking corporation, with its office and principal place of business in Roswell, New Mexico, engaged in the general banking business.

The appellant is a domestic corporation organized under the laws of the State of New Mexico, with its principal place of business in Las Cruces, New Mexico, and engaged in buying and selling cotton. In this connection it employs a number of agents as cotton purchasers, delegating these agents with authority to issue and accept drafts and bills of exchange in the purchase of cotton, on its "Cotton Acceptance Account", and furnishing these agents with a pad of such bills of exchange, each one bearing a serial number.

The appellant carried on its banking business with the State National Bank of El Paso, Texas, maintaining several accounts therein, one being labeled "Cotton Acceptance Account", whereby money was borrowed from time to time by appellant cotton company from the State National Bank of El Paso, Texas, to honor drafts and bills of exchange drawn upon this account.

Cotton purchasing agents engaged by appellant were authorized to accept cotton acceptances when drawn by the producer,

who was required to sign the acceptances or the drafts.

It is deemed advisable to set forth, at this time, the terminology of the exact cotton acceptance bill of exchange, which is the subject matter of this suit, inasmuch as repeated reference will be made to same throughout this opinion. It is as follows:

"Suspense Purchase

"Lawrence Walker Cotton Co., Inc.    No. 4688
"Las Cruces, N, M.    12–7 1949
"Pay to the Order of Herbert A. Luttrell    $10,285.21
"Ten thousand two hundred eighty five & 21/100 Dollars
"The obligation of the Acceptor arises out of the purchase from the Drawer
of 87 B/C. The Acceptor acknowledges that he holds ――― bale tickets in trust for the bank and agrees that the bank shall hold title to said cotton until the amount of the draft is repaid.
"Value Received and Charge to Account of
"Lawrence Walker Cotton Co., Inc.
            "Las Cruces, New Mexico
"State National Bank, El Paso, Texas.
    "I hereby certify the cotton herein sold is free from liens and encumbrances.
                "Herbert A. Luttrell, Seller
"Accepted 12–7–1949
        "Lawrence Walker Cotton Co., Inc.
        "By Herbert A. Luttrell
"For Purchase 87 bales cotton.
"Endorsed:—Herbert A. Luttrell. Pay to the Order of any Bank, Banker or Trust Co. All prior endorsements guaranteed.
"8 Roswell State Bank    Roswell, New Mexico."

Appellant engaged one Herbert A. Luttrell as one of its cotton purchasing agents, on or about the 1st of December, 1949. It furnished him with the above-mentioned pad of cotton acceptance bills of exchange. Luttrell was to work in the Roswell area, purchasing cotton there. He was known to various members of appellee bank prior

to this time. Luttrell had not executed any of these cotton acceptances until December 7, 1949, when he executed the above set forth instrument. He extracted the blank instrument from the middle of the pad, the first number of the drafts in the pad bearing serial number 4676. The draft in question was payable to the order of Herbert A. Luttrell, in the sum of $10,285.21 on the cotton account of appellant, for the stated purpose of purchasing 87 bales of cotton. Luttrell certified, as provided in the draft, that the cotton sold was free from liens and encumbrances, and he signed the draft as Herbert A. Luttrell, Seller. The draft was endorsed: "Lawrence Walker Cotton Company, Inc:, by Herbert A. Luttrell".

On the following day, December 8th, Luttrell endorsed the draft and presented it to the appellee bank for deposit. The draft was accepted by the bank, and Luttrell was permitted by the cashier to draw a check against the deposit in the amount of $500. From the record it appears that this was the limit of the personal credit of Luttrell with the bank, and this advance was made on the same theory that a loan would be made to him had he applied for one.

On December 9th Luttrell returned to the bank, stating that he desired to withdraw all of the remaining amount of the check, advising the bank that it was nec-

essary to have the money immediately to pay for the cotton which Luttrell had purchased. The teller of the appellee bank then stated that the draft had not as yet cleared and that payment, accordingly, could not be made. Luttrell insisted that the teller contact the drawee, the bank, State National Bank of El Paso, Texas, to verify the genuineness and validity of the draft. This was thereupon done and, after a detailed explanation of the item had been given to the State National Bank of El Paso by appellee teller, the latter was advised by the El Paso Bank that the item was good and, if the identity of Luttrell was not in question, the item should be paid. The item was paid and the balance of the draft, which had been entered in a personal account of Luttrell, was delivered to him in cash, less the expenses of the telephone call from appellee to the State National Bank of El Paso. The item in question reached payee bank on December 10, 1949. The latter immediately called Lawrence Walker, president of appellant company, inquiring whether or not the bank should pay the item and, upon instructions of the appellant and its officers, refused the same, after which complaint was filed.

As may have been gathered from the above recital of facts, the said Luttrell had, in fact, not purchased any cotton from a producer, but executed the above instrument as a means of obtaining the face value thereof by false pretenses. Luttrell immediately resigned from his position as a cotton purchasing agent and precipitously fled this jurisdiction, being thereafter apprehended in New York City by agents of the F. B. I. At the time of his arrest he had on his person $1,980, presumably the remnants of his ill-gotten gain from the above transaction. This sum was thereafter deposited in the registry of the trial court for proper application following adjudication of the rights of the parties hereto. Luttrell is now serving a prison sentence for his actions herein.

At the end of appellee's case, appellant moved for a directed verdict. This was overruled. At the end of appellant's case, appellant renewed its motion, which was likewise overruled. Appellee thereupon moved for a directed verdict in its favor. This motion is as follows: "Mr. Carpenter: Comes now the plaintiff and after the defendant rested its case and announced it has rested and moves the Court to take the cause from the jury and direct a verdict in favor of, or moves the Court to direct a verdict of the jury and take the cause and all issues from the jury other than to return a verdict for the plaintiff, for the reason that there is no issue to be submitted to the jury, there is no dispute as to the amount involved, no controversy on it, no dispute as to agency, and the only other issue that is in the case is did the bank act honestly and in good faith, and

the burden of proof according to law is upon the defendant to show bad faith on the part of the plaintiff. No proof has been offered of any kind on which any inference might be based which would establish malfides or bad faith. For the reasons stated plaintiff is entitled to judgment and is entitled to an instructed verdict." ·

It would be noted that thereupon the court stated as follows:

"Is it agreed there is no other issue except bad faith on the part of the plaintiff bank?

"Mr. Garland: Yes sir.

"Mr. Carpenter: Yes sir."

On the following morning the court stated that if counsel for plaintiff desired to renew. his motion the court would direct a verdict in favor of the plaintiff. Appellee having renewed its motion, same was sustained.

While seven assignments of error appear in appellant's brief, only two need be considered on appeal. The first is the question of whether or not the court erred in applying the Fiduciaries Act of New Mexico, Article I, Chapter 36, N.M.S.A., 1941; and, second, whether the court erred in allowing appellee interest on the amount of the judgment from the time the same was paid to agent Luttrell. These points will be discussed in the order mentioned.

A review of the testimony discloses no evidence of bad faith, either actual or implied, upon any of the officers or agents of the appellee bank. The instrument itself reflects that it was commercial paper, executed for a purpose of acquiring 87 bales of cotton. Luttrell was known, not only to the teller, James Lusk, but also to Kenneth O. Wilbank, cashier of appellee bank. No evidence appears of any defalcations or frauds being accomplished by Luttrell to the knowledge of either of said individuals. Luttrell had sufficient standing with appellee bank to warrant a $500 advance on the proceeds of the large deposit.

Appellee bank, through its teller James Lusk, informed Luttrell it would take five. or six days for that particular item to clear the State National Bank at El Paso, Texas. Luttrell stated that that was all right, but since he had purchased the 87 bales mentioned in the instrument, he would need $500 of the amount of the draft immediately, if possible. The teller and the cashier conferred briefly and decided that the small advance would be in order. On the following day, when Luttrell requested the balance of the draft money, a proper refusal was made by the bank. At the insistence of Luttrell, a telephone call was made to the State National Bank of El Paso, as above stated, and the information given the El Paso bank by appellee's teller, the instructions of the drawee bank to honor

the draft, and subsequent payment of the balance involved, all point unerringly to good faith on the part of appellee.

The trial court held, and properly so, that reasonable men could not differ on this phase of the case. It should not be forgotten that the agreed issue in dispute was whether there was bad faith on the part of appellee bank in this transaction. Had the jury found for the defendant on this issue, the duty would have devolved upon the trial court to set such a verdict aside and to render judgment for the plaintiff non obstante veredicto. It is proper to direct a verdict for one party where it would be necessary to set aside a verdict for the adverse party. Gildersleeve v. Atkinson, 6 N.M. 250, 27 P. 477; Lutz v. Atlantic & P. R. Co., 6 N.M. 496, 30 P. 912, 16 L.R.A. 819; Lockhart v. Wills, 9 N.M. 263, 50 P. 318; and Armstrong v. Aragon, 13 N.M. 19, 79 P. 291.

We feel that this case is governed by the provisions of the Fiduciaries Act of New Mexico, same being Article I, Ch. 36, N.M.S.A., 1941, which constitutes the Uniform Fiduciaries Act. It was adopted by Ch. 26, Laws of New Mexico, 1923. Three sections thereof appear to be controlling.

"Sec. 36-101. In this act * * * unless the context or subject-matter otherwise requires:

" 'Bank' includes any person or association of persons, whether incorporated or not, carrying on the business of banking.

" 'Fiduciary' includes a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust or estate.

" 'Person' includes a corporation, partnership, or other association, or two (2) or more persons having a joint or common interest.

" 'Principal' includes any person to whom a fiduciary as such owes an obligation.

"(2) A thing is done 'in good faith' within the meaning of this act, when it is in fact done honestly, whether it be done negligently or not."

"Sec. 36-106. If a check or other bill of exchange is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, payable to the fiduciary personally, or payable to a third person and by him transferred to the fiduciary, and is thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, the transferee is not bound to inquire whether

the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith."

"Sec. 36–109. If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts, that its action in receiving the deposit or paying the check amounts to bad faith."

While the phraseology of each of these sections indicates exculpation of a bank when it is sought to be charged by a fiduciary's principals, these sections, nevertheless, create a statutory right in a bank, and this court holds that an action similar to that at bar may be brought by the bank acting in good faith against a faithless fiduciary's principal to enforce payment of an instrument dishonored by the principal.

This is a case of first impression in the State of New Mexico, inasmuch as the Uniform Fiduciaries Act has not received the attention of the Supreme Court. Some interesting cases have been collected in an annotation appearing in 114 A.L.R. 1588 et seq., which follow a leading case of Colby v. Riggs National Bank U. S. Court of Appeals for the District of Columbia, 1937, 67 App.D.C. 259, 92 F.2d 183, 114 A.L.R. 1065.

Inasmuch as the cases collected under this note are restricted to an interpretation of the Uniform Fiduciaries Act, affecting rights and obligations arising from payment of personal obligations with trust funds, the value of these cases is somewhat diminished. It would appear, however, that from these decisions, the courts in those cases would have applied the act to the instant case.

It should be noticed that in Sec. 36–106, supra, it is provided that if the check or

other bill of exchange " * * * is thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary *or otherwise,* the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith." (Italics ours.) Under the above-mentioned section, the proceeds of the defalcation do not have to be applied toward extinguishment of the fiduciary's debt. This is seen by the italicized phrase "or otherwise".

In the instant case, the bill of exchange was deposited in the fiduciary's personal account. Sec. 37–109, supra, provides in effect that if a fiduciary makes a deposit in a bank to his personal credit of checks, a description of which, in the statute, fits the instant instrument, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary, and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary, without being liable to the principal unless, as is also mentioned in Sec. 36–106, the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation, as such, in making the deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

The above provisions of the Uniform Fiduciaries Act received the careful attention of the Supreme Court of Pennsylvania in Davis v. Pennsylvania Company, 1940, 337 Pa. 456, 12 A.2d 66. This case was an attempt by beneficiaries of a trust to impose upon a bank, which was the depository of the trust funds, liability for embezzlements committed by the trustee. A judgment was entered in the lower court for the defendant, notwithstanding the verdict, and the plaintiff appealed. A substitute trustee brought this action to recover moneys which, after the death of the former trustee, were discovered to have been embezzled by the latter.

The embezzling trustee had carried a personal account with the defendant bank for a number of years, and during the period of his trusteeship carried a second account in the name of the trust estate. In order to accomplish his defalcations, the said trustee would give securities of the trust to the defendant bank to sell for the trust account and, after defendant made the sale and credited the proceeds to that account, would promptly draw a check to his order, personally, sign it as trustee,

deposit to his own account in defendant bank, and subsequently withdraw and appropriate the money. He would sometimes vary this procedure by pledging securities of the trust estate to the bank as collateral for loans; after the bank sold the securities to liquidate the loans and credited the proceeds to the trust account, the trustee would transfer the money to his personal account in the same manner.

The court, in affirming the decision of the trial court, carefully and succinctly outlined the salient features of the Uniform Fiduciaries Act, and it is deemed advisable to quote rather liberally from this opinion [337 Pa. 456, 12 A.2d 68], as follows:

"The liability of defendant for accepting the deposits in the trustee's personal account of the checks signed by him as fiduciary, and for paying checks drawn on that account whereby the trust moneys were ultimately embezzled, is governed by section 9 of the Uniform Fiduciaries Act of May 31, 1923, P.L. 468, 20 P.S. § 3393, which provides that 'If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary * * * the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary, and the bank is authorized to pay the amount of the deposit, or any part thereof, upon the personal check of the fiduciary, without being liable to the principal, unless the bank received the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.' The words 'bad faith' are not defined in the act, but section 1(a), 20 P.S. § 3311(1)(a), states that 'A thing is done "in good faith," within the meaning of this act, when it is in fact done honestly, whether it be done negligently or not.' Since 'bad' is the antonym of 'good', it follows that a thing is done in bad faith, within the meaning of the act, only when it is done dishonestly and not merely negligently.

"There is no evidence, nor indeed any contention, that defendant had actual knowledge that the trustee was committing a breach of his obligation as fiduciary. The only question, therefore, is whether there were such facts known to defendant that its action in the matter amounted to bad faith. As has been previously pointed out by this court, section 9 of the Uniform Fiduciaries Act lays down the same test of responsibility in this respect that section 56 of the Negotiable Instruments Law of 1901, P.L. 194, 56 P.S. § 136, does in regard to notice of an infirmity in a negotiable instrument or defect in the title of the person negotiating it. This section of the Negotiable Instruments Law was merely

declaratory of the common-law ruling that it was not sufficient to establish notice of such infirmity or defect in title by proof of circumstances which ought to excite the suspicion of a prudent man, but that it was necessary to prove actual bad faith.

"At what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty, is, unlike negligence, wilful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith. (Union Bank & Trust Co. v. Girard Trust Co., 307 Pa. 488, 500, 501, 161 A. 865), unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,—that is to say, where there is an intentional closing of the eyes or stopping of the ears.

"There is nothing in the present case to convict defendant of bad faith in honoring the checks drawn by the trustee as fiduciary and deposited by him in his personal account and those making withdrawals from the latter account. Plaintiff points to the number (eighteen over a course of two years) and the amount of these transfers, but loses sight of the fact that defendant presumably knew nothing about the assets of the trust, or what other bank accounts the trustee might be maintaining, or what proportion of the entire estate was represented by the $18,400 transferred from the trust account to the personal account. As far as defendant was informed the $18,400 might have constituted only a small part of the trust funds, and might have been owing to the trustee because of commissions due him over a long period of years or of advancements made by him for the purchase of investments. The very purpose of the Uniform Fiduciaries Act was to facilitate banking transactions by relieving a depository, acting honestly, of the duty of inquiry as to the right of its depositors, even though fiduciaries, to check out their accounts.

"Plaintiff maintains that the first of the transfers by the trustee should have invited defendant's suspicion in that it resulted in the trust account being overdrawn by about $4,000. It appears that three days before that transfer defendant had sold for the trustee bonds of which the proceeds amounted to approximately $4,500, but this sum was not credited to the trust account until a week after the transfer had been made. There was nothing extraordinary or questionable about this, because at the time the bank allowed the transfer it had in its possession either the proceeds of the sale of the bonds or the obligation of the purchaser to pay for them, so that the overdraft was amply secured and the bank was merely extending to a depositor the not unusual courtesy of allowing a withdrawal from the account before the actual credit-

ing of the purchase money for the securities sold.

"A careful study of the record reveals no facts or circumstances which should have made defendant suspicious that the trustee was embezzling the funds of the estate or that there was any serious irregularity in his transactions. Much less was there any evidence to charge it with the dishonesty or bad faith which the Uniform Fiduciaries Act prescribes as the sine qua non of liability. This is especially true in view of the fact that Nathan H. Davis had been a trustee of the estate for twenty-seven years, during which time nothing untoward had ever occurred."

Applying the provisions of the Uniform Fiduciaries Act to the case at bar, as did the trial court, the sole issue was, as stipulated by the attorneys of record, limited to bad faith on the part of appellee. The question of negligence, if any, on the part of appellee was not an issue to be submitted to the jury. Accordingly, the trial court was correct in directing a verdict in favor of plaintiff.

Appellant corporation transacted business with a presumed knowledge of the existence of the New Mexico Fiduciaries Act. Appellant engaged Luttrell as its agent, placing in his hands blanks which, when executed, are negotiable. Appellant selected as its drawee bank the State National Bank of El Paso, Texas, an agent which, by telephone, authorized appellee bank to pay the balance of the bill of exchange. Appellee had no notice of Luttrell's fraud, was not in bad faith in the premises in any respect, and it is entitled to recovery of the principal amount due herein.

The remaining question is the correctness of the trial court in imposing interest on the face amount of the judgment, at six percentum per annum from December 9, 1949 until paid. The controlling statute in this State is Sec. 53–603, N.M.S.A., 1941, which provides as follows:

"The rate of interest, in the absence of a written contract fixing a different rate, shall be six (6) per cent per annum, in the following cases:

"First. On money due by contract.

"Second. On judgments and decrees for the payment of money when no other rate is expressed.

"Third. On money received to the use of another, and retained without the owner's consent expressed or implied.

"Fourth. On money due upon the settlement of matured accounts from the day the balance is ascertained.

"Fifth. On money due upon open account, after six (6) months from the date of the last item."

The only section of this statute that could have any application here is the second sub-paragraph, namely, "On judgments and decrees for the payment of money when no other rate is expressed." Were the suit one against the trustee, Luttrell, the third sub-paragraph would apply. However, the appellant did not receive this money under any theory of the case. In fact, the sum in controversy was embezzled by Luttrell. Appellant received no benefit in any way by the action of Luttrell and, by the very action of the court herein, must reimburse appellee for the latter's loss. The judgment should be amended by deleting therefrom the provision granting to appellee interest on the face amount of the judgment at the rate of six (6) per cent per annum from the 9th day of December, 1949, and, instead, allowing interest only from the entry of the original judgment. Credit will be allowed, of course, for the amount heretofore paid to the plaintiff. Except as last above determined, relative to the provisions for interest, the judgment of the District Court will be affirmed.

And it is so ordered.

SADLER, McGHEE and COMPTON, JJ., concur.

LUJAN, C. J., and COORS, J., not participating.