262 P.2d 378

### STATE v. TIPTON.
### No. 5677.

Supreme Court of New Mexico.
Oct. 23, 1953.

upon the refusal of the trial court to direct a verdict of not guilty upon defendant's motion made at the close of the state's case, and again made at the close of the entire case. The argument in support of this objection is based upon his claim that the testimony of the state's witnesses is contradictory and that of the prosecutrix so inherently improbable as to be unworthy of belief.

The court has the right, and it is its duty, to withdraw a case from the jury, and direct a verdict if the evidence in the case is undisputed, or if the evidence is so conclusive that the court would set aside a verdict if considered in opposition to it. Lockhart v. Wills, 9 N.M. 263, 50 P. 318; Roswell State Bank v. Lawrence Walker Cotton Co., Inc., 56 N.M. 107, 240 P.2d 1143. Does the case before us come within either of the rules stated above?

The testimony offered in the case, and submitted by the court to the jury, tended to establish that the prosecutrix, Myrna Fisher, at the time of the alleged offense was fifteen years, two months and twelve days of age, lived with her father and mother at 612 Calhoun Street, Clovis, New Mexico, and was a student at Junior High School in said city. That the prosecutrix on December 24, 1952, together with other teen age girls and boys attended a dance at the Palladium Dance Hall in Clovis.

Smith & Smith, Clovis, for appellant.

Richard H. Robinson, Atty. Gen., Fred M. Standley, Asst. Atty. Gen., for appellee.

LUJAN, Justice.

Appellant was convicted of the crime of statutory rape. He appeals from the judgment of conviction thereupon imposed. The sole assignment of error is predicated

While at said dance she met the defendant whom she had never seen before. She danced with him about three or four times. That at the close of the dance the defendant asked to take her home, she declined his invitation but finally decided she would go with him and Mr. and Mrs. Don Miller.

There is sharp conflict in the testimony concerning what occurred after prosecutrix entered defendant's car. Prosecutrix testified that when she got into the car it was understood that defendant and the Millers would take her to Bob's Cafe at First Street and Main Avenue where all would join her crowd. That instead of going to Bob's Cafe Don Miller drove to the Sunset camp ground where he and his wife got off. That the defendant helped Mrs. Miller carry some Christmas packages into their cabin. On his return therefrom the defendant and she got in the front seat of the car. The defendant instead of driving to Bob's Cafe drove out into the country, approximately one and one-half miles from town where he stopped the car on the side of the road. What happened next can best be told in the words of the prosecutrix herself.

"* * *

"Q. What did he do, if anything? A. Well, in the front seat?

"Q. Did he have his arms around you? A. No, sir, he was holding my hands, my arms.

"Q. With both his hands or how?

A. Yes, at first, and then he held them with one hand, both my arms with one hand.

"Q. How were you dressed that night? A. I had on a pink dress and white moccasins and a green coat.

\* \* \* \* \* \*

"Q. Was any of your clothes removed? A. Yes, sir.

"Q. What? A. All of it.

"Q. Was that in the front seat? A. Back seat.

"Q. Now, with reference to the front seat, what, if anything, now, did the defendant do while he was in the front seat? A. He put his finger or fingers up me.

"Q. Do you know whether he inserted a finger or more or what? A. I am not sure.

"Q. Did you suffer any pain at that time? A. Yes, sir.

"Q. Are you certain that nothing but his hand was inserted in you at that time? A. I am positive.

"Q. But you say you did suffer pain? A. Yes, sir.

\* \* \* \* \* \*

"Q. Were you bleeding in the front seat after he inserted his hand in you? A. Yes, sir.

"Q. Was that just a little bit or profusely? A. Well, I am not sure, but it was quite a bit.

\* \* \* \* \* \*

"Q. Did he have sexual intercourse with you in the back seat of that car? A. Yes, sir.

"Q. He inserted his private parts in you? A. Yes, sir.

*    *    *    *    *    *

"Q. What did you do while you were in the back seat? A. Well, I struggled a lot and screamed. I screamed most of the time.

*    *    *    *    *    *

"Q. Do you know what time it was, Myrna, when you got home? A. It was between 2:20 and 2:30, somewhere along there.

*    *    *    *    *    *

"Q. Did you report to your mother what had occurred? A. Yes, sir."

The mother of prosecutrix testifying corroborated her as to the time she left home and when she returned. That when she came into the house she had blood all over her clothing, moccasins and her legs and that she told her what the defendant had done to her that night.

Val Baumgart, Sheriff of Curry County, testified that he found blood spots on the cushion of the back seat of defendant's car.

Jerry L. Blair, a medical technician, testified that he made a test of the spots on the cushion and found them to be human blood. That the blood was type B and that Myrna's blood was type B, RH positive.

Don Webster, a deputy sheriff, testified that while the defendant was in the sheriff's office he observed the defendant's hands and noticed that he had long fingers and long well kept finger nails.

Dr. John Conway testified as follows:

"Q. Doctor, where were the abrasions on the outside with reference to the vaginal opening? A. Just to the right and to the lower portion of the vagina.

"Q. Were there any cuts on the outside? A. No, sir.

"Q. Were the cuts within the vaginal tract? A. Yes, sir.

"Q. How deeply were they within the tract? A. They were the full depth of the vagina.

*    *    *    *    *    *

"Q. You said there was these marital indications, that is the girl had had intercourse prior to this time? A. Say something of a large enough size to stretch the outlet considerable had been introduced, I couldn't say what it was.

*    *    *    *    *    *

"Q. Would you discuss your opinion in that with the Jury and specifically as to whether it was done, could have been done with two fingers, or two fingers on a man's hand or some other instrument. Would you give us the benefit of your opinion on that? A. It was done with a sharp instrument.

I have no way of knowing what, but this injury that was produced on the inside of this patient's vagina was caused by something sharp. It was a sharp clean cut, and was clean as one could make with a surgical instrument. I would say it wasn't, in other words, a tear, it was a cut. I have no knowledge or information as to what could have caused it. It was something sharp.

"Q. Would you say it was some kind of a metal or glass instrument that may have caused it? A. I couldn't say. It was something that had a hard sharp edge. I would have no way of being able to distinguish between metal or glass.

"Q. You just couldn't tell? A. No, sir.

\*     \*     \*     \*     \*     \*

"Q. Doctor, would you say from a medical standpoint it would be impossible for a sharp or jagged finger nail on a man's finger to have caused the damage that you saw? A. Impossible is a word I wouldn't care to use.

"Q. You have, if I understand it, absolutely no fixed or positive opinion as to what instrument or what instrumentality caused the damage. A. I am certain it was caused by an instrument with a hard sharp edge, what, I haven't the faintest idea.

\*     \*     \*     \*·     \*     \*

"Q. Doctor, could we substitute a word impossible for improbable or could you say in your opinion as to whether or not it was improbable that that was caused by a fingernail? A. I think it is improbable."

It is unnecessary to state the evidence of the defendant and that of his witnesses. Suffice it to say that his testimony as well as that of his witnesses was in direct conflict with that of the prosecutrix and other state witnesses. The defendant denied taking prosecutrix out to the country in his car on the night in question and further denied ever having had intercourse with her. His explanation of his actions on the night of December 24, 1952, that he was at home at the time of the alleged offense, was evidently not believed by the jury. This was clearly a question of fact for the jury, and under the decision of this court, their verdict will not be set aside where the evidence is conflicting. Lacey v. Woodward, 5 N.M. 583, 25 P. 785; Green v. Brown & Manzanares Co., 11 N.M. 658, 72 P. 17; Stringfellow & Tannehill v. Petty, 14 N.M. 14, 89 P. 258; James v. Hood, 19 N.M. 234, 142 P. 162; State v. Sakariason, 21 N.M. 207, 153 P. 1034.

The jury heard and considered all of the evidence, including the above quoted testimony, that which supported the story of the complaining witness, as well as

that which tended to cast doubt on it, and concluded the defendant was guilty as charged. We believe there was sufficient evidence to take the case to the jury, and it is well settled in this jurisdiction that the court should not direct a verdict where there is substantial evidence to support, or tending to support, the charge. State v. Wilson, 25 N.M. 439, 184 P. 531; State v. Taylor, 26 N.M. 429, 194 P. 368; State v. Ulibarri, 28 N.M. 107, 206 P. 510; State v. Renner, 34 N.M. 154, 279 P. 66; State v. Martin, 53 N.M. 413, 209 P.2d 525. If the testimony of prosecutrix is so inherently improbable as to be unworthy of belief then, of course, a verdict of guilty cannot be said to have substantial support in the evidence. State v. Foley, 55 N.M. 590, 237 P.2d 1033; State v. Sanders, 54 N.M. 369, 225 P.2d 150; State v. Richardson, 48 N.M. 544, 154 P.2d 224; State v. Taylor, 32 N.M. 163, 252 P. 984.

For the reasons stated, we do not think the court erred in refusing to direct a verdict of not guilty, and that the verdict is supported by substantial evidence, and for that reason cannot be set aside by this court. The judgment will be affirmed, and

It is so ordered.

SADLER, C. J., and McGHEE and SEYMOUR, JJ., concur.

COMPTON, J., having heard the case below does not participate.