## Commonwealth *v.* Mussoline, Appellant.

Argued November 21, 1967.   Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*George A. Spohrer,* with him *Helen M. Stack,* and *Hourigan, Kluger & Spohrer,* for appellant.

Anthony B. Panaway, Assistant District Attorney, with him Arthur L. Piccone, First Assistant District Attorney, and Thomas E. Mack, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, April 16, 1968:

Appellant, Anthony Mussoline, was tried before a judge and jury and convicted of malicious mischief in connection with the dynamiting of a scrap yard owned by one Salvatore Gaudiano. Relying entirely on circumstantial evidence to prove Mussoline's guilt, the Commonwealth was permitted to establish, inter alia, that three small droplets of blood found 60 feet from the scene of the explosion were of the same type, "A", as that of appellant. It is uncontradicted that type A is the second most common blood type, appearing in approximately 30% of all human beings. Appellant has advanced several reasons for the inadmissibility of this evidence, including the argument that it was legally irrelevant to the issue of whether appellant was present at the scene of the crime.

In order to place the blood type evidence in its proper perspective, we shall review the Commonwealth's case in some detail. Three witnesses testified that early on the morning of February 10, 1965, at about 2:30 A.M., they heard a loud explosion in the area of Gaudiano's scrap yard. No one, however, saw anybody at the scene of the blast at that time. An expert witness testified as to the cause of the explosion and its origin. He concluded that dynamite had been placed under a davenport in the scrap yard office. In order to link appellant to this dynamite, testimony was introduced to show that Anthony Mussoline and his brother Barney were engaged in the business of strip mining (appellant apparently pursued this business as a sideline, for his main occupation was that of police

officer), that this business made use of high explosives, and that Barney had purchased some dynamite, in the name of the business only, about three weeks before the scrap yard explosion. No attempt was made to link the dynamite actually used in the blast with that purchased by appellant's brother.

The Commonwealth next sought to show motive. Salvatore Gaudiano, owner of the demolished yard, testified that on the day before the explosion he and appellant had inadvertently met in a local garage, whereupon a conversation ensued concerning a debt owed Gaudiano by appellant. No harsh words were exhanged, nor were any blows struck by either man. Gaudiano did tell Mussoline, however, that if appellant did not pay the money by the end of the week he (Gaudiano) would have Mussoline arrested. Gaudiano concluded his testimony by stating that the debt has since been paid, that he and Mussoline are still friends, and that they continue to do business with each other.

With the exception of the evidence recited above (evidence tending to show only that appellant had some possible motive for the crime, and that he had access to dynamite), the balance of the Commonwealth's case consisted entirely of an attempt to place Mussoline at the scene of the crime by the use of blood-type evidence. Viewing this evidence in a light most favorable to the Commonwealth, it appears that in 1960 Mussoline entered the Hazleton State General Hospital for surgery, pursuant to which his blood was then typed as Landsteiner A, Moss 2, Rh positive. The blood spots found near the scene of the crime were also of this type. A nurse at the Hazleton Hospital testified that on the morning of the crime, at approximately 3:15 A.M., Mussoline came to the accident ward with a two inch long laceration on the inside of his right forearm. He explained to the nurse that he had

sustained the injury about two hours before (well prior to the time of the explosion) when he slipped on some ice in his driveway while putting his car into the garage. According to Mussoline, he cut his arm on a piece of jagged concrete. When asked why he had waited so long before coming to the hospital, appellant told the nurse that he first believed the wound to be minor, and only after his wife urged him to obtain treatment did he finally come to the accident ward. The story told by the nurse was in all material aspects corroborated by a police officer who had interviewed appellant the following day while investigating the case. In addition to the nurse, the Commonwealth called to the stand the doctor who actually treated Mussoline's wound. He stated that the bleeding had substantially stopped by the time he saw the wound, and that it was probably caused by a sharp object such as a piece of glass. On cross-examination, however, the doctor admitted that the cut could also have been caused by a piece of jagged concrete. Finally, a police detective related that he had conducted an investigation of the blast area which indicated that no one knew of or saw anyone injured on the night of the crime.

We think it clear that under our own case law, as well as that of other jurisdictions, mere proof that a criminal defendant shares a blood type with that of samples found near the crime scene is legally irrelevant to show that the defendant was in fact present at the scene of the crime without *some additional,* independent evidence *tending* to show either (1) that the man who committed the crime did lose blood in the process or (2) that the defendant was present at the scene. In short, blood-type evidence such as this can only be used to *corroborate* other evidence of the defendant's whereabouts at the crucial time.

Pennsylvania's leading case in this area, *Commonwealth v. Statti*, 166 Pa. Superior Ct. 577, 73 A. 2d 688 (1950), presents a classic example of how blood-type evidence may be used to corroborate other testimony. In *Statti*, defendant was indicted for rape. Not only did the prosecutrix positively identify Statti as her assailant, but she also told of how she bit his finger during their struggle. In charging the jury, the trial judge carefully warned that " 'if there is blood of the same type as the blood of the defendant found about the person and garments of Mrs. Savicky [the prosecutrix], you are not to conclude in the same fashion that that means it was of necessity the defendant's blood. *It is merely a circumstance given to you in corroboration of the testimony of Mrs. Savicky.*' " 166 Pa. Superior Ct. at 585 n.5, 73 A. 2d at 693 n.5. (Emphasis supplied.) Similar language appears in the body of the Superior Court opinion itself at page 584, 73 A. 2d at 692, where it is said: "Evidence of the result of these tests . . . was properly admitted as a circumstance bearing on the identification of the defendant, in corroboration of the testimony of the prosecuting witness that he was her assailant."

By comparison, the Commonwealth's evidence in the present case offers no corroboration whatsoever. Even the other bits of circumstantial evidence presented go only to *motive* and *ability* to commit the crime. This evidence in no manner indicates that Mussoline was in fact near the scrap yard on the night of the explosion. Any inference of *that* fact must come solely from the blood spots and appellant's lacerated arm. Since mere guess and conjecture would have to underpin such an inference, the evidence of blood-type cannot be deemed legally relevant to this case.

A study of cases from other jurisdictions also supports the conclusion that a mere similarity between a

defendant's blood and blood samples found at the crime scene, or, as is frequently the case in rape prosecutions, a similarity between the blood type of the victim and blood samples found on defendant, his car, or his clothing, is not relevant evidence of defendant's presence at the scene unless supported by something else. In *Shanks v. State,* 185 Md. 437, 45 A. 2d 85 (1945) evidence that the accused's coat had bloodstains whose type matched that of his alleged rape victim was held competent evidence *after* defendant had explained the bloodstains as being the result of a fight with a third party whose blood turned out to be a different type than that found on the coat. Thus, the evidence was used to impeach the defendant's testimony rather than to place him at the scene of the crime. There was also, in *Shanks,* eyewitness identification by the prosecutrix.

In *State v. Alexander,* 7 N.J. 585, 83 A. 2d 441 (1951), cert. denied, 343 U.S. 908, 72 S. Ct. 638 (1952), the defendant in a murder case admitted presence at the scene, but claimed self-defense. Thus, the prosecution was permitted to introduce evidence that the defendant's blood type matched blood found on the handle of the murder knife as support for its theory that defendant had become enraged when the decedent cut defendant's hand with the knife. Other cases where blood-type evidence has been used to corroborate separate testimony include *State v. Tipton,* 57 N.M. 681, 262 P. 2d 378 (1953), a rape case in which the blood-type identity between samples found in defendant's car and prosecutrix's own blood was used to substantiate the victim's eyewitness identification, and *Davis v. State,* 189 Md. 640, 57 A. 2d 289 (1948), a murder prosecution wherein the blood-type evidence was used in conjunction with the fact that defendant had stolen decedent's car and was apprehended in it. Cf. *State*

*v. Thomas,* 78 Ariz. 52, 275 P. 2d 408 (1954), cert. denied, 350 U.S. 950, 76 S. Ct. 326 (1956).

*Baney v. People,* 130 Colo. 318, 275 P. 2d 195 (1954) presents an excellent example of the irrelevancy of uncorroborated blood-type evidence to place a defendant at the crime scene. In this case the prosecution's evidence consisted of the following: (1) testimony by a bartender that he had seen decedent with defendant on the night of the rape (victim died after the assault and the charge was increased to murder); (2) testimony of a deputy sheriff and a doctor to whom decedent had recited her entire ordeal; (3) similarity of blood type between decedent's blood and that found in defendant's car. At trial, the blood-type evidence was allowed because it corroborated the story allegedly told to the sheriff and the doctor by the decedent. However, on appeal, the Supreme Court of Colorado held the sheriff's and the doctor's testimony to be hearsay. Without this vital link in the prosecution's case, the court held that the conviction could not stand on the uncorroborated blood-type evidence and the bartender's testimony. It said at 130 Colo. 327, 275 P. 2d 199: "There is absolutely nothing in this record to indicate that the Type 'O' blood found in the car came from the body of Miss Gall."

We are of course sensitive to the oft-quoted doctrine that evidence to be relevant need not be so probative as to support an entire case by itself. However, we are also aware of many areas in the law where certain types of evidence are deemed not legally relevant unless they can be supported by additional testimony. Thus, for example, where drunken driving is an issue one may not introduce evidence tending to show that a driver had been drinking unless this evidence is coupled with testimony on the issue of how much alcohol in fact was in the bloodstream and how much

it would take for an individual of that size to become intoxicated. *Wentworth v. Doliner,* 399 Pa. 356, 160 A. 2d 562 (1960); *Fisher v. Dye,* 386 Pa. 141, 125 A. 2d 472 (1956). Also, it has been firmly established that "[w]henever the condition of a particular place or thing at a certain time is in question, evidence of its condition at a prior or subsequent time is inadmissible, unless there is accompanying proof that it had not changed in the meantime." *Murray v. Siegal,* 413 Pa. 23, 29, 195 A. 2d 790, 793 (1963).

The reason behind such rules is clear. Although evidence of a man's drinking, for example, may be in one sense "relevant" to the issue of whether he was able to operate his car safely—relevant because it does indeed make the likelihood of his drunken driving greater than that likelihood would be without such evidence, nevertheless, the law presumes this evidence legally irrelevant without some additional corroboration. This is so because the inquiry into truth is only slightly advanced by such evidence, if advanced at all, while the attendant prejudice spawned by the testimony rises markedly. Such, we believe, is the case when a jury is permitted to hear expert testimony on blood typing which is really nothing more, in the present case, than proof that somebody bled near the scene of the crime and that this defendant, along with 30 percent of the entire population, might have been such person. There has not been presented here one shred of evidence that the person responsible for dynamiting Gaudiano's yard actually lost blood during the process. Nor has the Commonwealth been able to offer any additional evidence, direct or circumstantial, that Mussoline was anywhere near the scene of the crime on the night in question.

We are therefore convinced that the lower court erred in refusing to sustain defendant's objections to

the admission of the blood test evidence on the ground of irrelevancy. However, even with the presence of this blood-type evidence, we are also convinced that the Commonwealth's case falls woefully short of establishing guilt beyond a reasonable doubt. Having shown merely a weak motive, access to dynamite, and the possibility that Mussoline, along with 30 percent of the entire population, was among the group of people who might have shed blood at the scrap yard, this case presents a clear example of insufficient evidence.

The order of the Superior Court affirming the court below is reversed, the judgment of the Court of Quarter Sessions of Luzerne County is reversed, appellant's motion in arrest of judgment is granted, and he is hereby discharged from custody.

Mr. Justice JONES dissents.

DISSENTING OPINION BY MR. JUSTICE COHEN:

This Court has repeatedly stated that matters not raised in or considered by the court below cannot be considered on appeal for the first time. *Wynnewood Civic Association v. Lower Merion Township Board of Adjustment,* 406 Pa. 413, 419, 179 A. 2d 649 (1962); *Rome Township Referendum Recount Case,* 397 Pa. 331, 155 A. 2d 361 (1959); *Muse-Art Corporation v. Philadelphia,* 373 Pa. 329, 95 A. 2d 542 (1953); *Prenzel v. Apex Hosiery Co., Inc.,* 299 Pa. 17, 148 Atl. 915 (1930), and numerous other cases. Despite this well settled principle, the majority opinion discusses an issue which was never raised in the court below, apparently not raised in the Superior Court, never mentioned or alluded to in appellant's petition for an allowance of appeal to our Court, and only raises its head for the first time in appellant's brief in a rather cursory, superficial treatment of the problem. After carefully perusing the entire record before us, I am

firmly convinced that the sole objection raised by appellant to the admissibility of the blood test evidence was that its admission violated the Uniform Business Records as Evidence Act, May 4, 1939, P. L. 42, 28 P.S. §91b, which permits certain business records to be admitted in evidence under appropriate safeguards as an exception to the hearsay rule of evidence. Moreover, we granted the appeal in this case solely because of the apparent state of confusion with respect to the proper application of the Business Records Act. Needless to say, the confusion will continue to exist since the majority steadfastly avoids deciding the case on the only issue properly subject to our review. Not only does the majority opinion decide an issue not subject to our review and not fully or adequately briefed by either appellant or the Commonwealth but, in addition, compounds the error by reaching an erroneous conclusion on a question (the blood test) which in no way affects the majority's ultimate outcome of the case, i.e., the granting of a motion in arrest of judgment.

While I agree with the majority that a motion in arrest of judgment would normally be proper under the facts and circumstances of this case, I must hasten to add that we are powerless to grant such relief. Although appellant did argue the motion in arrest of judgment in the court below, the record filed with our Court indicates that the motion was apparently not pursued in the Superior Court, never argued in the petition for allowance of an appeal, and never seriously contended in the briefs or at argument before us. The majority in granting the motion in arrest of judgment apparently relies upon the statement of questions involved in appellant's brief as a sufficient indication that the motion in arrest of judgment had not in fact been abandoned. It will suffice to quote verbatim appellant's statement of the questions involved:

"Did the Court below err in refusing Appellant's Motion in Arrest of Judgment and Motion for a New Trial: (1) in admitting a hospital record under the Uniform Business Records as Evidence Statute where neither identity, mode of preparation, or qualifications of the person making the entry had been established; (2) in admitting a hospital record for the purpose of circumstantially proving Appellant's presence at the scene of the crime; and (3) in admitting a hospital record showing the blood type of the Appellant, in order to determine whether blood found near the scene of the crime was in fact that of the Appellant."

It is readily apparent from reading appellant's own statement of the issues presented that the only aspect of the trial being challenged on appeal is the various alleged errors committed by the court below with respect to the admissibility of the blood tests. Moreover, the summary section in appellant's brief only requests our Court to grant a new trial[1] and not to reverse the court below with respect to its refusal to grant the motion in arrest of judgment. While the action taken by appellant in not arguing this issue was obviously injudicious on his part, our Court should not, as the majority does, act as a "super advocate" contrary to the myriad of judicial precedents heretofore studiously adhered to by our Court. Consequently, the majority has erred in three respects, namely: (1) discussing the relevance of the blood tests when not properly before our Court; (2) discussing the relevance of

---

[1] In appellant's prayer for relief he requests only the following:

"It is respectfully submitted, therefore, that based upon the foregoing law and cases, the court committed reversible error, entitling the Appellant, in all justice, *to a new trial*." (Emphasis supplied). Appellant's brief contains no argument or reference whatsoever to the motion in arrest of judgment other than the above quoted section in his statement of the questions involved.

the blood tests when a discussion thereof is irrelevant to its ultimate disposition of the case, and (3) the grant of a motion in arrest of judgment when such relief had been abandoned by appellant on appeal.

I would, however, on the basis that the verdict was against the weight of the evidence, grant appellant's motion for a new trial.

I dissent.