[Crim. No. 16881. First Dist., Div. One. Apr. 20, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
RUDOLPH VALLEZ, Defendant and Appellant.

**COUNSEL**

Braverman & Gorelick and Robert A. Braverman for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Timothy A. Reardon and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LOW, J.*—**Defendant was charged with burglary, rape and oral copulation. His motions to dismiss the information and to suppress evidence were denied. After a jury trial, defendant was found guilty of all three counts and was sentenced to state prison. We have reviewed the contentions made on appeal and we affirm the judgment.

After retiring to bed about 11 p.m. on December 1, 1975, Robert K. was awakened by a man pinning his arms back. The intruder said he had a knife and pressed a metal object against Mr. K.'s neck. He asked for money and was told the only cash was in Mr. K.'s wallet. The intruder then tore a pillowcase into strips, tied and blindfolded Mr. K., and pulled him to the floor.

Mrs. K. awoke during the commotion, and her experiences with the intruder were far more damaging. After blindfolding her and threatening her with a knife, the intruder proceeded to rape her, orally copulate her, and force her to orally copulate him. Afterwards he tied her with strips from the torn pillowcase.

---

*Assigned by the Chairperson of the Judicial Council.

While the assailant was tying up Mrs. K., her son, Steve, arrived home in his truck. Upon learning of Steve's arrival, the intruder turned off the bedroom lights (which he had turned on after blindfolding the K.'s), and the K.'s heard the door close. Mrs. K. freed herself and called for her son Steve, who called the police immediately.

Although the room had been dark except for the time they were blindfolded, the K.'s became aware of several of the intruder's physical characteristics. Both had noticed that he spoke with a Mexican accent and that he had a breathing problem, probably asthma. During the rape Mrs. K. had noticed that the assailant had little or no body hair. The intruder had long hair on his head, however—something noticed by Mr. K. when he was first awakened.

Menlo Park Police Officer Jerry Rogers was on solitary patrol when he received a radio report of the incident. He was informed that the suspect in the rape was possibly Mexican, that he appeared to suffer from asthma, and that he had fled the scene through the back yard. He drove to the intersection of Willow and Middlefield, near the K.'s residence. Anyone heading east would likely pass through that intersection.

Within a few minutes, Officer Rogers saw a car heading east on Willow Road going between 55 to 60 miles per hour in a 25 miles per hour zone. Rogers chased the car, stopped it, and questioned the driver, defendant Rudolph Vallez.

Officer Rogers first noted that the defendant was sweating profusely and was breathing rapidly. When questioned about this, the defendant said the car heater was on. Officer Rogers saw, however, that the heater was in fact off. Defendant was not wearing a coat. The car's exterior was covered with dew. When asked where he was going, defendant replied he was hurrying home to Newark. When Officer Rogers asked defendant what he was doing in the area, defendant said he was looking for a nightclub. There are no nightclubs in the area. During the discussion the defendant glanced at his wrists as if to check on the time, then reached inside his pocket, producing a watch which he strapped on his wrist.

Having noticed that defendant had a Mexican accent, that he was breathing heavily, and that he had mud and grass on his shoes, Rogers asked his radio dispatcher to run a check on defendant through the Newark police files. Five minutes later the report came back that defendant had prior arrests for indecent exposure and for prowling.

Rogers then asked for and received permission to look in the car. He found a ring in a pocket of a coat left in the car.

Defendant was taken to the Menlo Park police station, advised of his *Miranda* rights, and questioned by the police. Defendant said he had stopped in Menlo Park at Burgess Park, about six blocks from the K.'s home. At one point early in the interview, defendant asked, "Why don't you have them come over and try and identify me?" At no time before this had the police mentioned multiple victims.

The police removed defendant's clothing. Defendant wore no underwear, and had very little body hair. A photograph was taken and a tape recording was made of defendant's voice, and he was then released.

Defendant's pants were later tested for the presence of semen, and the test results were positive in the area of the fly. Mrs. K.'s nightgown was tested and found to be stained with semen from a man with type A blood. Defendant has type A blood. Both Mr. and Mrs. K. are type O.

A "voice tape lineup" of six voices, including defendant's, was made and was played to the K.'s. Both identified the defendant's voice on the tape and defendant was arrested on December 3, 1975.

█ Defendant contends that his detention after the traffic stop was illegal and that therefore the voice tape and defendant's incriminating statement made at the police station should have been suppressed as products of the illegal detention.

Initially it should be noted that Officer Rogers stopped defendant for more than simply a speeding violation. Rogers had purposely positioned his car as a strategic response to information that a particular crime had been committed. The facts of defendant's accent, heavy breathing, and muddy shoes matched quite reasonably with the information on the crime provided by the police broadcast. When combined with the report on defendant's prior sex-related offenses, these facts justified a reasonable suspicion on Rogers' part warranting detention for questioning. Nothing suggests that the detention was of long duration.

█ A temporary detention may be justified by circumstances falling short of those creating probable cause to arrest a suspect. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) A police officer may stop and question persons on public streets when the

circumstances would indicate to a reasonable person in a similar situation that such action is called for in the proper discharge of the officer's duties. Where there is a rational belief connecting the suspect with criminal activity, a detention for reasonable investigation infringes no constitutional rights. (*People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632] [cert. den., 425 U.S. 934 (48 L.Ed.2d 175, 96 S.Ct. 1664)].)

■ Defendant next argues that the voice tape from which the K.'s made an identification was impermissibly suggestive. More specifically, the claim is that the tone quality of defendant's voice was significantly different from the tone quality of the other five voices on the tape.

■ Any pretrial identification procedure which is unduly suggestive and which gives rise to a substantial likelihood of irreparable misidentification violates due process and must be suppressed. (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].) ■ Defendant challenged the identification and on November 29, 1976, a pretrial hearing was conducted before Judge Alan W. Haverty to determine whether the procedure was unfair. (*People* v. *Rodriguez* (1970) 10 Cal.App.3d 18, 30 [88 Cal.Rptr. 789].) ■ The determination of the fairness of the identification procedures depends upon a consideration of all the facts and circumstances.

■ The trial court listened to the tape, and heard testimony concerning the making and playing of the tape to the K.'s. The defendant and five others spoke the same words. Officer William L. Frank selected five individuals who either spoke Spanish or who could speak with a Mexican or Spanish accent. Each of the five listened to a tape of defendant's voice and each attempted to imitate his speech.

We have listened to the tape. While none of the five imitators was especially talented in impersonating the defendant's voice, the differences between the voices was not so great as to be unfair or impermissibly suggestive. There was a wooden, rather lifeless quality to all the voices on the tape. Each speaker read eight short sentences. The trial court noted the difference in tone quality between the defendant's voice and the other voices, but found that this difference was not unduly suggestive and had not affected the K.'s identification.

■ Although voice lineups are being more widely used as a means of identification, limited attention has been focused on the special

problems associated with their use. (See Shmukler, *Voice Identification in Criminal Cases Under Article IX of the Federal Rules of Evidence* (1976) 49 Temple L.Q. 867; Annot., Identification—Accused's Voice, 70 A.L.R.2d 995.) Several factors can contribute to suggestiveness in a voice lineup so as to undermine its reliability as an identification procedure. A person can modify the sound of his or her voice as to tone, pitch, volume or speed. Accents can be especially difficult for a person to imitate. The use of a machine—in both the creation and playback of the tape—adds technical variables to the process which must also be controlled.

 Suggestive identification procedures are invalid because they deny a defendant the due process right not to be subjected to likely misidentification. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 712 [83 Cal.Rptr. 608, 464 P.2d 64] [cert. den., 406 U.S. 972 (32 L.Ed.2d 672, 92 S.Ct. 2418)]; *Neil* v. *Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375].) The dangers inherent in a voice lineup dictate that special precautions be taken to insure fairness to the defendant when such a procedure is used. In creating the voice tape, efforts should be made to use a collection of voices which are similar in tone, pitch, volume and accent. Also, steps should be taken to insure uniform sound quality for all voices on the tape and uniform volume when the tape is played to witnesses. Passage of time seriously affects memory and a voice lineup should be conducted for witnesses as soon as practicable. In evaluating the fairness of the identification, trial courts are to be guided by *People* v. *Faulkner* (1972) 28 Cal.App.3d 384, 391 [104 Cal.Rptr. 625]: "the crucial issue is whether appellant has been singled out and his identification made a foregone conclusion under the circumstances [citation]."

 The record and the tape support the finding of the trial court that the pretrial identification was fair and not impermissibly suggestive. Thus, there is no need for the prosecution to establish an independent basis for the in-court identification. (*People* v. *Rodriquez, supra,* 10 Cal.App.3d at p. 31.) The identification testimony of the K.'s was properly admitted.

 Defendant next contends that he should have been allowed to conduct his own "voice lineup." Defendant was arrested on December 3, 1975, arraigned in superior court on February 17, 1976, and scheduled for trial on September 27, 1976. Defendant moved for a "voice lineup" on September 20, 1976, and that motion was denied on the ground that it was not timely. The trial date was later continued to November 29 due to hospitalization of the victim.

■ In appropriate circumstances and upon timely request, an accused should be afforded a pretrial lineup in which witnesses can participate in an attempt to resolve identification problems. (*Evans* v. *Superior Court* (1974) 11 Cal.3d 617 [114 Cal.Rptr. 121, 522 P.2d 681].) But a trial judge is vested with broad discretion to deny such a motion if untimely. Motions made shortly before trial will generally be denied unless good cause is shown for the delay.

■ Defendant had an abundance of prior opportunities to request a voice lineup. The trial court did not abuse its discretion in denying the request made one week before the scheduled trial date.

■ Next defendant asserts that the trial court should have *sua sponte* disallowed expert testimony that semen stains on Mrs. K.'s nightgown were from a man with type A blood. Defendant, as well as 40 percent of the world's population, has type A blood. Although defendant failed to object to this testimony at trial, he contends that the evidence of blood type should have been excluded because its probative value was outweighed by its prejudicial effect. Absent a timely objection at trial, the issue need not be considered on appeal. (Evid. Code, § 353.) Nevertheless there is no rule excluding blood type evidence that might connect defendant with the crime.

The rules of blood test evidence in paternity cases, to prove that a man could *not* be the father, but not to determine that a man *is* the father (Evid. Code, §§ 890-897) are unique to those proceedings. In criminal trials all relevant evidence is admissible. (Evid. Code, § 351.) In sum, for two independent reasons, the lack of any objection at trial and because the evidence was relevant and admissible, we find no error.

■ Defendant next contends that a new trial should have been granted because of newly discovered evidence and for insufficiency of evidence to support the verdict. The "newly discovered evidence" consists of several affidavits which may show that one of the People's exhibits was not the booking photograph from December 2, 1976, but was an old photo taken from the Newark police files. The trial judge reviewed these affidavits and concluded that they were merely cumulative to the testimony presented by the defense as to the defendant's hair appearance. Since neither victim relied on the defendant's length of hair to identify him, the "new" photo would have no materiality. ■ A motion for new trial on the grounds of newly discovered evidence is subject to the sound discretion of the trial court, and its ruling will not be

disturbed except on a showing of clear abuse. (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843] [cert. den., 429 U.S. 847 (50 L.Ed.2d 119, 97 S.Ct. 131)].) There is no abuse of discretion here.

The record contains an abundance of evidence to support the verdict and the trial court properly denied defendant's motion for a new trial. Denial of a motion for new trial on grounds that the evidence is insufficient to support the verdict will be reversed only in those rare instances when, as a matter of law, there is no substantial evidence to support the verdict. (*People* v. *McDaniel, supra,* 16 Cal.3d at pp. 177-179.)

Finally, defendant contends that the court abused its discretion in refusing to commence mentally disordered sex offender (MDSO) proceedings. True, defendant was not ineligible for such proceedings. But for the past 17 years defendant has been in prison all but seven weeks. The trial court expressed doubt that even if defendant were a mentally disordered sex offender, there could be any realistic chance of successful treatment. Defendant's record dates back to 1955 with psychopathy proceedings under Penal Code sections 261, 288, 314 and 647, subdivision (g).

The excessive criminality and prior lack of success with psychotherapy are adequate reasons to deny defendant's application for MDSO proceedings.

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied May 19, 1978, and appellant's petition for a hearing by the Supreme Court was denied June 15, 1978.