[Crim. No. 31489. Second Dist., Div. Five. Sept. 14, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
TONEY LEE LINDSEY, Defendant and Appellant.

**COUNSEL**

Gary K. Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—After a trial by jury, defendant Toney Lee Lindsey was found guilty of having committed violations of Penal Code[1] section 288a, subdivision (c) (oral copulation by force—count I) and section 459 (burglary first degree—count II), with a finding, pursuant to section 461, that defendant with the intent to do so inflicted great bodily injury during

---

[1] Unless otherwise specifically noted, all statutory references are to the Penal Code.

the commission of the burglary. With respect to an October 5, 1976, offense, defendant was found guilty of violating section 459 (burglary first degree—count IV).[2] Regarding a December 1, 1976, assault, defendant was found guilty of violating section 261, subdivision 2 (rape resistance overcome by force—count V) and section 459 (burglary first degree—count VI) again with a finding under section 461 that defendant, with the requisite intent, inflicted great bodily injury during the commission of the burglary.

For purposes of sentencing, pursuant to the requirements of section 654, counts I and II were merged as were counts V and VI. The merged sentences were ordered to run consecutively to each other. The sentence under count IV was ordered to run concurrently with the sentences imposed on counts II and VI.

The following evidence was introduced at trial by the prosecution.

In the early morning hours of July 9, 1976, Suzanne H. had fallen asleep on a living room couch while watching television. At approximately 3 a.m. she awoke to find a man standing over her. The man immediately grabbed Suzanne's neck and stated, "Don't move, don't make any noises or I'll kill you." Fearing sexual assault, Suzanne informed the man that she had syphilis, to which he replied, "Well, you are going to do it the other way then." While still being held by the neck, Suzanne was pulled from the couch onto the floor. There, while in a kneeling position, the man forced Suzanne into an act of oral copulation. After ejaculating, the man momentarily lost his grip and Suzanne immediately went to the front door of her residence. After opening the door, she demanded that the man leave; he nonchalantly walked out the back door.

The man had placed a pillow upon Suzanne's face, thus initially awakening her. Though her hands were effectively held immobile, Suzanne was able to dislodge the pillow from her face by moving her head. Suzanne testified that although the lights in the residence were not on, outdoor lighting permitted her to clearly see her assailant. Suzanne stated that she consciously made an effort to observe her assailant's features. Suzanne identified defendant as the assailant. A dark blue jacket later taken from defendant's residence pursuant to a consent search was identified by Suzanne as being similar to that worn by defendant during the attack.

---

[2] Defendant was found not guilty of attempted rape (§§ 664, 261, subd. 3) as alleged to have occurred on October 5, 1976, in count III of the information.

Suzanne testified to another attack committed by defendant on October 5, 1976. Under similar circumstances, Suzanne had fallen asleep while watching television in her living room. She awoke to find a man standing over her. The man immediately grabbed her neck with one hand and with the other hand placed a paring knife taken from the kitchen to her throat. The assailant stated, "Don't make any noise or I will stick this in your neck." Suzanne, mistakenly believing that her husband was home, screamed his name. In response, the man ran from the residence by way of the back door.

Though the assailant wore a nylon stocking over his head, Suzanne testified that she could see through it. Further, based on similarity of physical dimensions and voice recognition, Suzanne identified the assailant as defendant. In addition, Suzanne testified that she had identified defendant as the assailant during a police lineup.

On December 1, 1976, Deborah S. was ill and was asleep in the bedroom of her residence when she was awakened at 10:30 p.m. by a man. The man had placed a knife at her left cheek and a pillow covering her face. Feeling that her best defense was to gain the man's confidence, Deborah engaged in conversation with the man lasting approximately one hour and forty-five minutes. Deborah succeeded in having the man place the knife on the floor. The man, at one point, disrobed and entered the bed with her. The man had been wearing dark gloves, gray sweatshirt and pants, and tennis shoes. Deborah attempted to dissuade the man by telling him, "Why don't you memorize my phone number and leave right now and then call me and we will talk on the phone and we will get to know each other. Maybe we can go to a movie or something." Nonetheless, the man forced Deborah to engage in an act of sexual intercourse during which time the man climaxed. The man then left. Exhausted by her illness, Deborah fell asleep for two hours before contacting neighbors. The next morning she called the police. Deborah was taken by the police to a hospital where a pelvic examination revealed the presence of semen.

Deborah, though admitting there was little light in the bedroom, identified defendant as her assailant. On cross-examination, Deborah conceded that she consciously attempted not to look at defendant and admitted that at a police photo lineup she could only identify defendant as the closest to the person who assaulted her. On redirect examination, Deborah reaffirmed her in-court identification and also testified as to her identification of defendant at the preliminary hearing. She testified that at

the preliminary hearing, ". . . I saw his profile I had a really close look. I remembered his profile of his body and his face very, very vividly. More so than the full, right-on, because I looked, I looked—I remember looking at the side of his face when he wasn't looking. When he was standing in the doorway of my bedroom and hallway. And that is when I got the best look at him." Deborah indicated that she was not shown defendant's profile during the lineup.

At approximately 2:30 a.m. of December 1, 1976, Los Angeles police officer on routine patrol issued a traffic citation to defendant for riding a bicycle through a red light. At the time defendant was observed to be wearing a gray sweatshirt and tennis shoes.

Two days later, on December 3, an envelope on which "Debbie, Toney and Love" were written was placed into the mailbox at Deborah's residence. Latent fingerprints lifted from the envelope matched an exemplar taken from defendant.

Over objection, a police chemist, after being qualified as an expert, was permitted to testify regarding his analysis of the slide taken during the pelvic examination of Deborah and of blood and saliva samples taken pursuant to court order from defendant. The chemist explained that it is possible to determine the blood type from an analysis of a male's semen. The chemist testified that one slide taken from Deborah disclosed the presence of antigenic substances consistent with an "O" blood type and that the blood and saliva samples taken from defendant revealed an "O" blood type. The chemist stated that approximately 36 percent of the population would secrete type "O" blood antigenes into body fluids such as semen. On cross-examination, the chemist did concede that if Deborah was a secreter it would have been possible for her blood type to appear in her vaginal secretions. No typing of Deborah's blood was conducted.

The defense consisted primarily of the alibi testimony of defendant's girl friend, Sharon L. She testified, not without numerous inconsistencies, that she had been living with defendant at various addresses during the period the offenses were committed. She testified that as part of their living arrangement she was with defendant during the entire evening of July 9. However, rebuttal testimony indicated that Sharon began living with defendant as of October, later that year. Regarding December 1, she testified that defendant was positively with her that night from midnight on. On cross-examination, she conceded that defendant could have been

out of the house during the time Deborah was assaulted and admitted knowledge that defendant had received a ticket possibly after midnight. Sharon gave no alibi testimony concerning October 5, stating that she could not remember that date. In addition, the defense developed minor discrepancies in the descriptions given by Suzanne and Deborah to police. Defendant elected not to testify.

Defendant appeals from the judgment of conviction, making the following contentions: (1) the trial court abused its discretion in denying defendant's various motions for substitution of appointed counsel; (2) defendant was denied his constitutional right of self-representation; (3) it was error to admit testimony concerning blood typing over defense objection; and (4) the trial court erroneously instructed the jury that the commission of forcible rape or oral copulation alone could constitute great bodily injury. With the exception of defendant's last contention, which requires the striking of the findings of great bodily injury in counts II and VI, judgment is affirmed.

## 1. *Substitution of appointed counsel*

Defendant on four separate occasions moved to have appointed counsel, a representative from the public defender's office, substituted. Each motion was denied. No reporter's transcript of defendant's first two motions was provided on appeal. The record of the third motion made on July 12, 1977, reveals the following:

Defendant, on that date, charged that his appointed counsel was not representing him "to the best of her knowledge." After noting the requirements of *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], the trial court held a hearing outside the presence of the jury and in the absence of the prosecutor, wherein defendant was afforded a full opportunity to state the reasons for his request to substitute counsel. Defendant stated that despite his request, counsel was not going to call Susan Evans as a defense witness. In response, the public defender represented that she had interviewed that person and based on the interview "determined that in my best judgment she would not make a good witness and might even be detrimental." Specifically, the public defender stated that the testimony defendant indicated that could be expected from the witness "would not be forthcoming." Defendant did not indicate the relevancy of the proposed testimony to be gained from Ms. Evans.

The public defender further stated, in reply "[t]hat although I have had several conversations with my client, my client refuses to indicate to me what his defense is. He absolutely has indicated that if he tells me anything, including what questions I might ask of him with regard to the case, he will not tell me because I will tell the District Attorney." In conjunction with the public defender's statements, the trial court read into the record a psychiatric report of defendant which stated that "[h]e [defendant] could probably cooperate with counsel if he chose, but he strongly believes that he knows all the answers about how to defend himself and will only provide the information that he feels is necessary. If there is a lack of cooperation, it is probably voluntary and not secondary to a severe mental impairment." The court denied defendant's motion indicating its reason "that if he is truly paranoid I don't think it is going to make any difference whether you [referring to the public defender] are the lawyer or whether we get him the finest lawyer by reputation in the state."

After the commencement of trial, defendant, on July 14, pursuant to a motion to substitute counsel and proceed in propria persona renewed his charges that the public defender was not representing him to the best of her knowledge. With commendable effort, the trial court again conducted a hearing outside the presence of jury and in the absence of the prosecutor to discuss the particulars of defendant's claim.

Defendant stated that his counsel failed to subpoena medical records that would indicate that he was physically incapable of lifting a person the weight of Suzanne with his left hand. In response, the public defender stated "after talking with my client and some consideration, I really think that they would be irrelevant, quite frankly." However, the public defender stated that nonetheless she would have the records subpoenaed. The transcript on appeal contains no further mention of the medical records. Apparently the records bore out the court's statement to the effect that the records would establish that defendant had been shot in the arm but not that there was a limitation of use at the time of the alleged criminal acts.

The remainder of defendant's complaints against the public defender involved the testimony of potential defense witnesses. Defendant indicated that he had requested the testimony of a person named Kathy. Defendant could not remember her last name, but represented to the court that he had previously given the public defender her phone number. According to defendant, Kathy would be a character witness for

the defense. In addition, defendant, without revealing what her testimony would be, stated that he wanted a Gwen Banks to testify. In response, the public defender, partially controverting defendant's statements, stated that defendant had mentioned these witnesses only a day or two previously. The public defender and defendant indicated that a meeting with these witnesses was scheduled.

Defendant stated that he also had requested the testimony of Sharon L. and Sandra Montgomery. The public defender represented that both persons had been interviewed and were previously placed on call.

After the prosecution had concluded its case-in-chief, defendant again accused his counsel of incompetence in failing to interview certain witnesses. The court conducted a third hearing out of the presence of the jury and prosecution. The hearing exclusively involved the testimony of Sharon L. who defendant indicated would provide him with an alibi. The public defender and the investigator appointed to the case each stated that they had just recently interviewed her and indicated to the court that, in their opinion, her testimony would be detrimental to the defense. Notwithstanding, the public defender acquiesced to defendant's demands and called Sharon L. as a defense witness. Her testimony was summarized above. It is interesting to note that at this juncture defendant made no mention of the other witnesses previously requested.

■ An indigent defendant has no absolute right to more than one appointed attorney. The determination whether to substitute appointed counsel rests within the sound discretion of the trial court. (*People* v. *Marsden, supra,* 2 Cal.3d 118, 123.) An exercise of discretion by a trial court will not be disturbed on appeal, unless it is shown by the defendant that his right to the assistance of counsel was substantially impaired by the continued representation by appointed counsel. (*People* v. *Mitchell* (1960) 185 Cal.App.2d 507, 512 [8 Cal.Rptr. 319].)

■ The principal disagreement between defendant and appointed counsel concerned whether certain individuals should be called as witnesses. The decision whether to call witnesses is considered to constitute trial tactics within the exclusive control of trial counsel. (*People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008].) A disagreement regarding trial tactics does not require the substitution of appointed counsel, unless the disagreement "signal[s] a breakdown in the attorney-client relationship of such magnitude as to jeopardize the

defendant's right to effective assistance of counsel." (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].)

The record in the instant case amply supports the conclusion that whatever breakdown occurred between defendant and his counsel was caused by defendant's intransigence and failure to cooperate. Such a showing is insufficient to support a motion to substitute appointed counsel. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 705 [83 Cal.Rptr. 608, 464 P.2d 64].) The public defender acquiesced in calling the only witness, Sharon L., represented by defendant to be relevant to the defense. The remaining witnesses were either shown to be only tangentially relevant to the defense, or were not shown to be relevant at all to the case. It was within the discretion of the public defender not to call witnesses determined by her through interview to be detrimental to the defense. No crucial defense was mistakenly withdrawn by counsel. Counsel is not required to manufacture a defense where none exists. (*People* v. *Booker* (1977) 69 Cal.App.3d 654, 669 [138 Cal.Rptr. 347].)

Defendant has failed to show that the trial court abused its discretion in denying his motions for substitution of counsel.

### 2. *Self-representation*

On July 14, after the commencement of trial, including the taking of a full day of prosecution evidence, defendant moved to proceed in pro. per. Citing the following excerpt from the record, defendant contends that he was denied his right to self-representation:

"THE DEFENDANT: I want you to do, I really would like some time to study the case and be pro. per. [¶] But since you advise me to the best of your knowledge it would be a bad idea for me to do this, and you are not going to give me any time, I don't have any choice.

"THE COURT: You are willing, then, to proceed with Miss Cunningham [Public Defender] as your attorney so we can proceed with this case?

"THE DEFENDANT: I am not willing, but your advice—

"THE COURT: You are willing to accept that advice?

"THE DEFENDANT: Yes.

"THE COURT: But it is your decision?

"THE DEFENDANT: Yes."

Earlier, the court had warned defendant of the pitfalls and dangers of self-representation.

Thus, specifically, it is defendant's contention that he did not voluntarily withdraw his motion to proceed pro. per. ■ While it is a violation of the Constitution for the state to force appointed counsel upon an unwilling defendant, a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (*Faretta* v. *California* (1974) 422 U.S. 806, 835 [45 L.Ed.2d 562, 581-582, 95 S.Ct. 2525]. See also *People* v. *Ruiz* (1968) 263 Cal.App.2d 216, 222-225 [69 Cal.Rptr. 473].) ■ Although the record is somewhat blurred by the games played by defendant, it is apparent that defendant here voluntarily withdrew his motion to proceed in pro. per. based on the advice given to him by the trial court.[3]

Had it not been for defendant's withdrawal, it would have been well within the discretion of the trial court to have denied the motion as defendant's request did not come "within a reasonable time prior to the commencement of trial." (*People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) The court had at one point in the argument on defendant's motion stated: "I cannot now recess this jury. They have already been impaneled. We started this case and there is no way that I can now stop and give you time to prepare the case, because I just can't do it." By these statements the court indicated that it would have rejected defendant's motion on that basis. Further, contrary to defendant's contention, the trial court was not required at any earlier time to "initiate any advice concerning the right to self-representation." (*People* v. *Salazar* (1977) 74 Cal.App.3d 875, 889 [141 Cal.Rptr. 753].)

### 3. *Blood-typing evidence*

The prosecution was permitted to introduce evidence that defendant's blood type was the same as that found to be present on the vaginal slides

---

[3]Defendant had on February 9, 1977, made a motion to proceed in pro. per., which the minute order of the proceeding indicates that the motion was withdrawn. No reporter's transcript of the proceeding was provided on appeal. Defendant argues that "[s]ince there is no record of the first motion it should not be assumed that the DEFENDANT voluntarily withdrew the motion . . . ." However, it was the burden of defendant to provide a record on appeal supporting his contention that error was committed at the trial level. Defendant failed to sustain his burden on this contention. Moreover, statements made by counsel (prosecution and defense) in the presence of defendant and to the trial court indicated that defendant had freely withdrawn the motion. Defendant, at the time, did not contest the statements.

taken from Deborah. The similarity of blood types had the effect of including defendant within the group of persons who could have possibly committed the assault against Deborah. Relying on cases involving the determination of paternity, the defense objected to the blood-typing evidence. The established rule in paternity cases is that blood-typing results are only admissible when such evidence has the effect of excluding the defendant as the possible father of the child. Where the blood-typing shows that the defendant merely *could* have been the father, such evidence is held to be inadmissible. When offered to prove paternity such evidence is held to be of no probative value and thus inadmissible. (See cases collected: Annot., 163 A.L.R. 939, 950; Annot., 46 A.L.R.2d 1000, 1019-1025; McCormick on Evidence (2d ed. 1972) § 211, pp. 520-523; 1 Wigmore on Evidence (3d ed. 1940) § 165a, pp. 610-613.)

In California, the admissibility of blood-typing in paternity cases is governed by the Uniform Act on Blood Tests to Determine Paternity as enacted in Evidence Code sections 890-897.

Evidence Code section 895, dealing with the admissibility of blood-typing in civil actions states: "If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence."

Section 895 has been interpreted as permitting the introduction of the results of blood-tests-to-include in accordance with the generally established rules for admissibility. As stated in *Hodge* v. *Gould* (1969) 274 Cal.App.2d 806, 808 [79 Cal.Rptr. 245], "[b]lood tests may be used to exclude a defendant as the possible father of a child, but no inference or presumption of paternity arises from the mere fact that such tests fail to exclude him."[4] (See also, Jefferson, Cal. Evidence Benchbook, General Principles of Relevancy, § 20.6, p. 244.)

---

[4]As enacted the Legislature deleted from section 895 the last sentence of the uniform act which provides that blood test results can be admitted to prove paternity depending on the rarity of the blood type. The deleted sentence reads: "[i]f the experts conclude that the blood tests show the possibility of the alleged father's paternity, admission of this evidence is within the discretion of the court, depending upon the infrequency of the blood type." This deletion has been construed by most writers to support the interpretation of section 895 which prohibits the results of blood tests which do not exclude the possibility of paternity. (Witkin, Cal. Evidence (2d ed. 1966) Demonstrative, Experimental and Scientific Evidence, § 660, p. 620; contra, 3 U.S.F.L.Rev. 297.)

Section 896 provides that the uniform act is applicable to criminal actions and that "(c) The court may direct a verdict of acquittal upon the conclusions of all the experts under the provisions of Section 895; otherwise, the case shall be submitted for determination upon all the evidence."

■ It is necessary for us to decide the issue of the relevancy of blood-typing evidence in criminal cases where the question of paternity is not involved. The court in *People* v. *Kemp* (1961) 55 Cal.2d 458, 478 [11 Cal.Rptr. 361, 359 P.2d 913] [holding no violation of Constitution in taking blood and saliva samples of defendant after arrest for rape-murder to determine whether he was of blood type corresponding to seminal fluid found in vaginal tract of victim] and *People* v. *Mummert* (1943) 57 Cal.App.2d 849 [135 P.2d 665] [seminal fluid found on slide taken from rape victim matched defendant's blood type, and blood type of victim found on defendant's clothing, admitted without apparent objection] have permitted the admissibility of such evidence without expressly addressing the issue of relevancy. The court in *People* v. *Vallez* (1978) 80 Cal.App.3d 46, 56 [143 Cal.Rptr. 914], admitted evidence of blood-typing in a criminal action stating, "[t]he rules of blood test evidence in paternity cases, to prove that a man could *not* be the father, but not to determine that a man *is* the father (Evid. Code, §§ 890-897) are unique to those proceedings. In criminal trials all relevant evidence is admissible. (Evid. Code, § 351.)" (Italics in orginal.) However, these statements were made in dictum, the court having first held that the defendant's failure to object at trial had waived any error concerning such evidence.

Cases from other jurisdictions are split on the issue of the admissibility of blood-typing in criminal cases not involving questions of paternity, with the majority of the jurisdictions holding that such evidence is relevant and therefore generally admissible. (Jurisdictions expressly holding blood-typing evidence relevant: Arizona, *State* v. *Thomas* (1954) 78 Ariz. 52 [275 P.2d 408, 416]; *State* v. *Brierly* (1973) 109 Ariz. 310 [509 P.2d 203, 212-213]; Colorado, *Roybal* v. *People* (1972) 177 Colo. 144 [493 P.2d 9, 13]; Connecticut, *State* v. *Walters* (1958) 145 Conn. 60 [138 A.2d 786, 791-792]; Florida, *Williams* v. *State* (1940) 143 Fla. 826 [197 So. 562, 564-565]; Illinois, *People* v. *Johnson* (1976) 37 Ill.App.3d 328 [345 N.E.2d 531, 534-535]; *People* v. *Gillespie* (1974) 24 Ill.App.3d 567 [321 N.E.2d 398, 402-403]; Maryland, *Shanks* v. *State* (1945) 185 Md. 437 [45 A.2d 85, 89-90]; Massachusetts, *Commonwealth* v. *DiMarzo* (1974) 364 Mass. 669 [308 N.E.2d 538, 543]; Missouri, *State* v. *Jones* (Mo.App. 1975) 518 S.W.2d 304, 309; New Jersey, *State* v. *Beard* (1954) 16 N.J. 50 [106 A.2d

265, 268-269]; North Carolina, *State* v. *Gray* (1977) 292 N.C. 270 [233 S.E.2d 905, 913-915]; *State* v. *Jacobs* (1969) 6 N.C.App. 751 [171 S.E.2d 21, 23]; Ohio, *State* v. *McGrew* (1971) 25 Ohio App.2d 175 [268 N.E.2d 286, 291]; Oklahoma, *Hendricks* v. *State* (Okla.Crim. 1956) 296 P.2d 205, 219; Pennsylvania, *Commonwealth* v. *Mussoline* (1968) 429 Pa. 464 [240 A.2d 549, 551-553]; *Commonwealth* v. *Statti* (1950) 166 Pa. Super. 577 [73 A.2d 688, 692]; Washington, *State* v. *Luoma* (1976) 14 Wn.App. 705 [558 P.2d. 756, 762]; federal, *Kemp* v. *Government of the Canal Zone* (5th Cir. 1948) 167 F.2d 938, 940; *United States* v. *Kearney* (D.C. Cir. 1969) 420 F.2d 170, 171, fn. 1; Jurisdictions finding blood-typing evidence admissible without discussion of the issue of relevancy: Alabama, *Dockery* v. *State* (1959) 269 Ala. 564 [114 So.2d 394]; Indiana, *Conrad* v. *State* (1974) 262 Ind. 446 [317 N.E.2d 789]; New Mexico, *State* v. *Tipton* (1953) 57 N.M. 681 [262 P.2d 378]; Wisconsin, *Watson* v. *State* (1974) 64 Wis.2d 264 [219 N.W.2d 398]; Other authorities supporting admissibility of blood-typing evidence: Annot., 163 A.L.R. 939, 952; Annot., 46 A.L.R.2d 1000, 1025-1027, 1036-1038; McCormick, *supra,* § 211, p. 517; 3 Wharton's Criminal Evidence (13th ed. 1973) § 631, p. 254; Jurisdictions holding blood-typing evidence inadmissible on grounds of lack of relevancy: Iowa, *State* v. *Peterson* (Iowa 1974) 219 N.W.2d 665, 671-672; New York, *People* v. *Robinson* (1970) 27 N.Y.2d 864 [317 N.Y.S.2d 19, 19-20, 265 N.E.2d 542]; *People* v. *Macedonio* (1977) 42 N.Y.2d 944 [397 N.Y.S.2d 1002, 366 N.E.2d 1355].)

In a leading case permitting the admissibility of blood test results, *Shanks* v. *State, supra,* 45 A.2d 85, evidence was received to the effect that "O" blood type found on the coat of the defendant accused of rape was of the same type as that of the alleged victim. After noting that approximately 45 percent of the population have "O" blood, the court rejected defendant's objection that the evidence was inadmissible because it was too remote. The court stated on page 89: "The objection of remoteness goes to the weight of the evidence rather than to its admissibility. To exclude evidence merely because it tends to establish a possibility, rather than a probability, would produce curious results not heretofore thought of. In this case the fact that the accused was somewhere near the scene of the crime would not, in itself, establish a probability that he was guilty, but only a possibility, yet such evidence is clearly admissible as a link in the chain. Similar evidence has never been questioned as being too remote. That is a question of weight to be determined by the Court or the jury." (See *State* v. *Walters, supra,* 138 A.2d 786, 791; *Commonwealth* v. *Statti, supra,* 73 A.2d 688, 692 "the admissibility of this evidence is not affected by the fact that Type O blood is common to perhaps 45% of the

people of the world. It was still competent as some evidence, just as evidence of how an assailant was dressed, however conventionally, would be competent though by no means conclusive of identity.")

Later in the opinion, the court in *Shanks* expressed its belief that juries would not "attach too much importance to the scientific evidence and might regard it as positive proof." (*Id.,* at p. 90.) In that regard, the court stated, "[b]lood types, therefore, are now matter of common or ordinary knowledge. Even were they not, if the jury or judge is told that 45% of the population have 'O' blood, we cannot assume that this statement would be disregarded and not given its proper weight in determining the evidentiary value of the testimony." (*Id.,* at p. 90.)

The jurisdictions which held blood-typing to be inadmissible in criminal cases have done so relying on the reasoning of the paternity cases. The courts have held that such evidence, since it shows that the defendant along with any other person with the particular blood type could have committed the crime, is irrelevant. In *People* v. *Robinson, supra,* 317 N.Y.S.2d 19, 19-20, a case involving the matching of semen taken of a murder victim with the defendant's "A" blood type, the court stated that such evidence "was of no probative value in the case against defendant in view of the large proportion of the general population having blood of this type and, therefore, should not have been admitted."

At the time that the *Shanks* case was decided, Maryland had statutory and case law which embodied the generally established rules concerning the admissibility of blood tests in paternity cases. Relying on the law formulated in those statutes and cases, the defendant in *Shanks* argued against the admission of the blood-test evidence. The court also rejected this argument, stating, "[i]f it be suggested that there is an analogy to bastardy cases where blood tests are used only to disprove paternity and where the statute permits testimony as to the result of the test 'only in case definite exclusion is established,' it must be borne in mind that the courts and the legislatures are there dealing with a situation where self-incrimination is involved and where the nonscientific evidence is often quite unreliable and scientific evidence may be conclusive as to nonpaternity. The blood of the accused must be taken to make such a test, and the statute limits the evidence thus given by him to that in his favor. The Maryland statute does not purport to establish a universal rule of evidence, and has no application whatever in other classes of cases."

(*Id.,* at p. 90. See *Cortese* v. *Cortese* (1950) 10 N.J.Super. 152 [76 A.2d 717, 719] "the field of contested paternity [is] where the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity.")

We believe the better rule is the one represented by the *Shanks* case, that the results of blood-typing tests are generally admissible in criminal actions, and that the rules of law evolved in the paternity area are limited in application to those actions, civil or criminal (e.g., child desertion), where parentage is at issue. (Witkin, Cal. Evidence, *supra,* § 662, p. 621; 16 So.Cal.L.Rev. 161, 173; *People* v. *Vallez, supra,* 80 Cal.App.3d 46.)

However, in adopting this rule of law, we also accept the limitation of its admissibility expressed by the court in *Commonwealth* v. *Mussoline, supra,* 240 A.2d 549. There the court stated, at page 551: "We think it clear that under our own case law, as well as that of other jurisdictions, mere proof that a criminal defendant shares a blood type with that of samples found near the crime scene is legally irrelevant to show that the defendant was in fact present at the scene of the crime without *some additional,* independent evidence *tending* to show either (1) that the man who committed the crime did lose blood in the process or (2) that the defendant was present at the scene. In short, blood-type evidence such as this can only be used to *corroborate* other evidence of the defendant's whereabouts at the crucial time." (Italics in original.)

In the instant case, the blood-typing results corroborated other evidence identifying defendant as the person who committed the assault: the positive identification testimony of Deborah; the envelope placed in Deborah's mailbox, which contained defendant's name and fingerprints; and the testimony indicating that defendant, while dressed in clothing identified by Deborah, was given a traffic ticket soon after the assault was said to have occurred. Therefore, the results of the blood-typing was properly admitted over defense objection, even though the testimony was wholly inadequate, in and of itself, and in the absence of corroboration, to identify defendant.[5]

---

[5]Defense counsel failed to take advantage of its opportunity to introduce evidence of Deborah's blood type. (See *State* v. *Beard, supra,* 106 A.2d 265, 269 [state did not have to rule out that defendant's own blood could have been present on clothing and accessories which matched the victim's blood]; and *People* v. *Wilson* (1953) 1 Ill.2d 178 [115 N.E.2d 250, 256].)

## DISPOSITION

Judgment is modified as to counts II and VI, striking the findings of great bodily injury made pursuant to section 461. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 587 [146 Cal.Rptr. 859, 580 P.2d 274].) In all other respects the judgment is affirmed.

Kaus, P. J., and Hastings, J., concurred.