Filed 9/9/24  P. v. Rangel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCOS RAYMOND RANGEL,<br><br>Defendant and Appellant. | F086405<br><br>(Super. Ct. No. F20903893)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Marcos Raymond Rangel was convicted by jury of forcible rape (Pen. Code,[1] § 261, subd. (a)(2)).  In addition, the jury found true two aggravating factors. (See Cal. Rules of Court, rules 4.421(a)(1) ["[t]he crime involved great violence …"], 4.421(b)(1) [the defendant's violent conduct "indicates a serious danger to society"].) The court found true an aggravating factor related to Rangel's convictions for robbery, both of which occurred subsequent to the forcible rape.  (See Cal. Rules of Court, rule 4.421(c).)  The trial court sentenced Rangel to the upper term of eight years in state prison and imposed a $300 parole restitution fine (§ 1202.4).

Rangel raises the following claims on appeal:  (1) the trial court abused its discretion by denying his third motion to substitute appointed counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); (2) the trial court erred by imposing the full-term sentence for his conviction, consecutive to the prison term that he was currently serving for a 2019 conviction for robbery; (3) the trial court failed to instruct the jury that it could not find that Rangel has engaged in violent conduct that indicates a serious danger to society (see Cal. Rules of Court, rule 4.421(b)(1)), unless the instant offense was "distinctively worse" than the ordinary commission of the offense; (4) the trial court improperly considered Rangel's convictions for robbery, both of which occurred subsequent to the forcible rape, in imposing the aggravated prison term; (5) the cumulative impact of the sentencing errors alleged in claim Nos. 3 and 4 violated his right to due process and his right to a fair trial; and (6) the trial court abused its discretion by imposing a $300 restitution fine pursuant to section 1202.4.

We conclude that remand for a resentencing hearing is required.  We otherwise affirm.

---

[1] All further undefined statutory citations are to the Penal Code unless otherwise indicated.

2.

## FACTUAL AND PROCEDURAL HISTORY

On February 17, 2023, the Fresno County District Attorney filed an information charging Rangel with forcible rape (§ 261, subd. (a)(2), count 1) and attempted sodomy by use of force (§§ 664, 286, subd. (c)(2)(A), count 2).  The information further alleged the following aggravating factors:  (1) Rangel had served two prior terms in prison or county jail under section 1170, subdivision (h) (Cal. Rules of Court, rule 4.421(b)(3)); (2) the crime involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); (3) Rangel's prior convictions as an adult or sustained petitions in juvenile proceedings are numerous or of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)); and (4) Rangel engaged in violent conduct that indicates a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)).

On February 4, 2021, Rangel made a *Marsden* motion, which was granted by the trial court.  He was appointed new counsel.

On November 16, 2022, Rangel made a second *Marsden* motion.  Following a hearing, that motion was denied.

On April 17, 2023, Rangel made a third *Marsden* motion.  The trial court denied his motion following a hearing.

On May 1, 2023, the trial court empaneled a jury to decide Rangel's case.

On May 8, 2023, the jury found Rangel guilty of forcible rape (count 1) and found true two aggravating factors.  (See Cal. Rules of Court, rules 4.421(a)(1), 4.421(b)(1)).

On June 6, 2023, the trial court sentenced Rangel to the upper term of eight years on count 1, which was imposed consecutive to a six-year sentence he was already serving for another offense.

A timely notice of appeal followed.

3.

*The Prosecution's Case*

### 1. Facts Underlying the Forcible Rape of V.S. (Count 1)

On the evening of January 3, 2016, V.S. received a phone call from her friend, Ramona, asking if she could pick up two men, Rudy and his brother, and drive them to Ramona's apartment. V.S. agreed. When V.S. arrived at Ramona's apartment, Ramona invited V.S. to have some beers with them, to which V.S. agreed.

As they drank beers, the group played games. Rudy later made a cocktail for V.S., who described herself as "buzzing" but not drunk. Later that evening, Ramona's son, Rangel, arrived with his girlfriend. An argument ensued between Ramona, Rangel, and Rangel's girlfriend. Ramona ushered Rangel and his girlfriend into her bedroom.

A few hours later, V.S. heard another argument occur near the bathroom involving Ramona, Rudy, and Rangel. V.S. went to use the bathroom after the argument.

As she exited the bathroom, Rangel punched her and pushed her into a spare bedroom, causing her forehead to hit the wall. Once inside of the bedroom, Rangel tried to remove V.S.'s pants. She resisted. Rangel positioned his body on top of hers, as she continued pushing him off. V.S. asked him, " 'Why are you doing this?' " Rangel punched V.S. in her jaw.

As she "came to," she saw her pants coming off. V.S. pleaded with Rangel "[not to] do this." In response, he punched her again, causing her to lose consciousness. As she regained consciousness, V.S. felt Rangel attempting to insert his penis into her anus. When he was unsuccessful, Rangel inserted his penis into V.S.'s vagina. V.S. was in and out of consciousness. However, when she awoke, Rangel told her, " 'Oh, you take the dick so good.' " After Rangel ejaculated, he told V.S. that "he would beat the shit out of [her]" if she left the room.

Rangel exited the room. V.S. curled up into a fetal position and vomited. She subsequently ventured out into the living room, half naked. The apartment was empty

4.

and the front door was open.  V.S. jumped into the hallway closet and hid until she heard Rangel tell Ramona, " 'Okay, mom, we're leaving now.' "  She returned to the spare bedroom where she found a pair of jeans on the floor, put them on, and searched for her belongings.

V.S. exited the apartment, but she encountered Rangel in the parking lot.  When he saw hear, he stated, " 'There's that bitch,' " and began walking towards her quickly.  Rangel punched her in the head again.  V.S. managed to make it inside of her car.  Rangel attempted to open the passenger's side door, but V.S. had locked it.  Rangel kicked her vehicle.

When V.S. arrived home, she sat in shock.  Unable to immediately call the police because her phone was missing, she texted her son using her tablet.  Her son came to her room, and V.S. used his phone to call 911.  The police and an ambulance arrived soon thereafter.

A day after the sexual assault, Forensic Nurse Cassandra Valdivia performed a sexual assault examination on V.S.  Valdivia documented multiple injuries on V.S., including:  a bruise on the right side of her head, bruises and tenderness to her left jaw, one broken and one bent fingernail, and bruises on her right arm, right hand, and thigh.  V.S.'s entire vaginal area was red, swollen, and contained "whitish secretions."  Valdivia collected samples from V.S.'s vagina.

### 2.  V.S.'s Statements to Police

On January 4, 2016, Fresno Police Sergeant Primitivo Diaz responded to a call regarding a sexual assault.  He spoke with V.S. at her residence.  V.S. informed Sergeant Diaz that a man named "Mike" had raped her at a friend's apartment in Fresno.  She recounted arriving at the apartment around 7:00 p.m. and consuming three beers while she, her friend, and two male companions played cards.  At some point in the evening,

Mike and his girlfriend had arrived at the apartment. V.S. insisted that she was not drunk that night.

V.S. explained that Mike got into an argument with her friend's two male companions in the hallway. When she eventually made her way to the bathroom, an argument ensued between V.S. and Mike. Mike pushed V.S. into a spare bedroom.

In the bedroom, Mike punched her on the left side of her face, almost knocking her out. When she came to, Mike was pulling down her pants and underwear. She yelled at him to stop, but he punched her again on the left side of her face, knocking her unconscious. When V.S. regained consciousness, Mike was raping her. She attempted to call for help, but Mike punched her a third time. He continued to vaginally penetrate her and attempted anal penetration as well. After ejaculating inside of her, Mike got dressed and left the bedroom, threatening her with physical violence on his way out.

V.S. tried to find her clothing but could only find her underwear and someone else's jeans. She hid in a hallway closet until Mike left the apartment. Eventually, she went back into the bedroom, found her jeans, and fled the apartment wearing her underwear and someone else's jeans, carrying her own jeans.

As V.S. ran to her car in the parking lot, Mike saw her, called out, " 'There's that bitch,' " and charged at her, punching her a fourth time before she managed to get into her car and drive away. Mike kicked the door as she left. V.S. identified Mike as a Hispanic male, about six feet and one inch tall, weighing approximately 160 pounds, and wearing his hair in a ponytail.

### 3. Rangel's DNA Matches CODIS Records

More than four years passed as the case inexplicably "[fell] through the cracks." In 2020, Fresno Police Detective Steven Taylor, who was assigned to the Sexual Assault Cold Case Unit, received notification from the Department of Justice that there was a "hit" on the DNA profile from V.S.'s case. The DNA profile from V.S.'s attacker

6.

matched Rangel's DNA profile. Detective Taylor contacted V.S. to ask if she wanted to proceed with the case, to which she agreed.

During an interview with Detective Taylor, V.S. explained that she had initially identified her attacker as a man named "Mike." Over the years, she identified Rangel from a wanted poster on the Fresno Police Department's website and learned that his real name was "Marcos." She also recounted the details of the rape to Detective Taylor.

Detective Taylor discovered that Rangel was in custody at Wasco State Prison. During an interrogation at the prison, Rangel denied knowing or having had sexual intercourse with V.S. Detective Taylor also interviewed Ramona and a man named Rudy. Rudy denied knowing Ramona or V.S., and Detective Taylor could not determine whether the Rudy with whom he spoke was the same individual present on the night of the incident.

Detective Taylor obtained a search warrant for Rangel's DNA. The DNA results confirmed that the Rangel could not be eliminated as the source of the DNA sample taken from V.S. after the sexual assault.

**The Defense's Case**

Rangel testified that on January 3, 2016, he had a consensual sexual encounter with V.S., who was intoxicated. During the encounter, Rangel claimed that he rubbed his penis against V.S.'s vagina. However, he denied having sex with V.S.

Rangel claimed that he became startled by V.S.'s behavior and fled the bedroom. On his way out, he grabbed V.S.'s car keys and attempted to steal her car but was unable to drive it away.

Eventually, V.S. came outside with Ramona, Rudy, and Rudy's brother. V.S. was very hostile, yelling at Rangel and calling him names. In response, Rangel punched V.S. once in the face.

Ramona also testified in Rangel's defense. She recounted that on January 3, 2016, she invited V.S. to her apartment to have drinks and play games. Also present at the apartment were Rudy and Rudy's brother. At some point, Rangel and his girlfriend arrived and went into Ramona's bedroom to see Ramona's grandchildren. While Rangel was in the bedroom, V.S. visited the bathroom multiple times. Rudy's brother joined V.S. in the bathroom at one point.

After Rudy's brother exited the bathroom, V.S. remained inside momentarily. When V.S. subsequently exited the bathroom, she was not wearing pants. V.S. expressed a desire to go home, so Ramona assisted V.S. in gathering her belongings and putting her pants back on. By this time, Rangel had already left the apartment.

Ramona helped V.S. to her car, where they encountered Rangel and his girlfriend in the parking lot along with Rudy and his brother. Ramona testified that the situation became chaotic, with V.S. threatening to call the police. Eventually, V.S. drove home. V.S. never told Ramona that she had been raped.

Ramona testified that she has another son named Mike, who was not present at her house that night.

Forensic toxicologist Eduardo Espiritu testified that on January 4, 2016, blood and urine samples were taken from V.S. V.S.'s urine sample tested positive for morphine at a level of 1.4 mg/l, with no other substances, including alcohol, detected. V.S.'s blood sample was negative for all substances tested, including morphine.

## DISCUSSION

### I. The Trial Court's Denial of Rangel's Third *Marsden* Motion

Rangel contends that the trial court abused its discretion by denying his April 17, 2023 *Marsden* motion. We find neither error, nor prejudice assuming error.

## A.      Background:  Marsden Proceedings

On February 4, 2021, Rangel made a *Marsden* motion, seeking to replace his appointed counsel.  Following a hearing, the court granted Rangel's motion and appointed him new counsel.

On November 16, 2022, Rangel made another *Marsden* motion to replace his appointed counsel.  Following a subsequent hearing, the court denied Rangel's motion.

On April 17, 2023, Rangel made his third *Marsden* motion seeking to replace his appointed counsel.

At the hearing, Rangel described his primary issue with trial counsel as "failures to provide [him] any opportunity to discuss important matters in this case."  He initially claimed that trial counsel was late in providing him with "certain documents" which hindered his ability to construct a defense to the charges:

> "[Rangel]:  So my last court appearance, counsel did come and see me and -- while at the jail, and she did bring me certain documents.  And now that I have these documents right before trial, I believe it's important that the defendant could receive these at an earlier stage, because receiving these actually inform me of a lot of accusations that are being held against me, and I think could prepare me also as to -- as to building a defense and doing whatever I can do [*sic*] help counsel prove my innocence.  And so, the fact that it took for me to have to ask her, you know, and being informed on so much within the case, I feel like it's all part of ineffectiveness to represent me, because that's not -- it's not just about me being informed, it is also I have brought to counsel's attention certain things that I see as part of the evidence and that I think can help me.  And I could state some of those things that I stated to counsel.  It is just that I feel like she never really gave me answers.  She expects me to go along with -- just go along with it."

Next, Rangel complained that trial counsel was too accommodating to the prosecution.  He explained:

> "[Rangel]:  And so my last court date -- also I believe it was a different judge here.  It was a lady -- and so the D.A., stated she wanted to trail the hearing because the witness or victim wasn't able to show up.  So the judge asked him why aren't they able to show up.  So that actually

showed me that that is a problem, because I believe that counsel representing me has a duty to speak up on it and let it be known that we are ready for trial and we are prepared to -- instead, I feel like she gives the D.A. a lot of slack."

Rangel further expressed dissatisfaction with trial counsel's general handling of the prosecution's motions in limine:

"[Rangel]: … I do have a document where it shows the motion brought forward by the District Attorney. And so seeing these motions I feel like a lot of them are not fair. And I feel like a lot of them can at least be spoken up on, at least her letting me know, you know, what the motions are all about. And so it is kind of hard when I'm receiving these documents, and I'm barely being informed of all these actions that were taken place that I feel like I could speak on, and I feel like would impact the trial, and I feel aren't fair, Your Honor, because one of the motions is using my criminal record against me when the accusations within this crime that they're alleging me of, I never -- I didn't have a criminal record back then.

"So, I would at least like to be informed on things like that and informed on how he is able to use that motion. It is not just that motion, it is every action that the D.A. -- that the District Attorney has brought forward."

Rangel further complained that trial counsel was resistant to strategical decisions that he felt were necessary to his defense, including, hiring a DNA expert or investigator:

"[Rangel]: And I have requested to her that because the crime being alleged that I committed, it is important to have a strong defense. In order to prove that, that in hiring some type of expert or investigator -- I have told her about that. And she said that if it comes down to it, then we can check on it, but I feel like there is certain evidence that even within the DNA, where I asked her about -- and I didn't really understand where she couldn't explain any of that to me. She wants me to wait until trial, and I feel like what am I waiting for? To -- being ambushed by things that I wasn't expecting and I'm trying to do the best I can to work with counsel's representing my behalf in order to -- specially if counsel is going to be representing me at trial."

Finally, Rangel alleged that one of the prosecuting attorneys had made an offer to resolve his case that had not been communicated to him. He described an instance in

10.

which a new deputy district attorney introduced himself to trial counsel and that attorney referenced an "offer." In response, trial counsel appeared confused and asked, "[W]hat offer?" Rangel claimed that he was never informed of that offer and stated, "[T]hat's a perfect example of the lack of communication and the ineffectiveness within her representation, sir."[2]

Trial counsel responded as follows:

> "[Trial Counsel]: Yes. So he did concede that I did see him multiple times. I went to the prison once. I went to the jail three times, which was including yesterday. The first three times he was not forthcoming at all. You know, I asked him multiple times how I'm going to explain how his DNA was inside -- inside the victim. And he is, like, I don't know, I don't know. I don't trust the process. And so essentially every single time I've seen him, except for yesterday, he just hasn't been forthcoming about his own case. So essentially it is just a waste of time due to his own jaded thinking about the process.

> "I obviously tried to do my best. Most appointed attorneys only see their client once in jail. I've seen him multiple times. So, it's pretty much due to his own self."

The trial court asked counsel about the documents Rangel claimed to have received late. Trial counsel explained:

> "[Trial Counsel]: So there was some documents that -- well, because it's a sex case, he is not entitled to some of the documents, and the Court can understand that. The preliminary hearing transcripts, I got them uploaded four days ago. I gave them to him. He sat through the preliminary hearing himself, obviously, and he took notes. I let him review everything that was in my trial binder, that was in the file. And if he needed more time or if he wanted a different attorney -- and I made this clear yesterday, if you want a different attorney, you need to tell me. So I made sure that he had everything and this should have been all discovered from his past attorneys. But once I knew what he didn't have, I quickly gave it to him."

The trial court asked counsel about Rangel's claim that trial counsel was too accommodating to the prosecution. In particular, the trial court asked about

---

[2] The record contains no evidence of any offer to resolve the case against Rangel.

11.

Rangel's claim that trial counsel did not object to the prosecutor's request for a continuance. Trial counsel explained that the prosecutor's requests were supported by good cause, and she was "not going to lose credibility with the Court or the D.A. just because I can ... object." Trial counsel opined that "[Rangel] wants me to do frivolous things, which I'm not going to do."

As for the motions in limine, trial counsel explained that she had provided the motions to Rangel to keep him informed on the issues, but Rangel disagreed with how trial counsel planned to argue those motions."

> "[Trial Counsel]: … I gave [Rangel] the D.A.'s motions in limine so he could kind of read up on them. Obviously it is my strategy of whether -- what's -- how I'm going to argue them and whatnot. He doesn't want his robbery to come in but looking at him he looks like he has been in prison. And I do not want the jury to speculate that he was in prison for sex crimes. So I was going to talk to him about that regarding whether even if the robbery happened afterwards or whatnot. I can't have the jury speculating why he was in prison because he looks like he has been in prison."[3]

The trial court also briefly discussed Rangel's desire to retain a DNA expert. Trial counsel explained that the parties had addressed Rangel's request for a DNA expert in a previous *Marsden* hearing. The judge presiding over that hearing agreed with trial counsel that a DNA expert was not necessary. According to trial counsel, "There needs to be an explanation of why his DNA is inside of her vagina," implying that a DNA expert would not be able to provide such an explanation.

With respect to the change in prosecuting attorneys assigned to his case, the trial court explained to Rangel that this was a normal part of the process. The trial court further explained that the issues related to Rangel's request for a DNA expert and details about Rangel's prior robbery conviction were tactical in nature.

---

**3** At the time of his trial, Rangel had multiple face tattoos, which he agreed, made it appear as if he had "prison tattoos all over [his] face."

At the conclusion of the hearing, Rangel represented that he was "going to continue to speak up on those issues when I think there is one. I want to work with my attorney. I want to bring forward and help her best while I can." When asked whether she had any additional comments, trial counsel surmised that the difficulty of Rangel's case stemmed from Rangel himself:

> "[Trial Counsel]: I think given the amount of times that I've tried to speak with him and explain, I think there is just a breakdown in communication. This is one of the hardest cases that I have in my case load and it is not due to the case, it is just due to the client. With that I'll submit."

The trial court denied Rangel's *Marsden* motion, explaining:

> "THE COURT: All right. The Court is certainly mindful of your complaints Mr. Rangel, and I've taken those all into account and addressed those with [trial counsel]. [Trial counsel], in the Court's view, does have a good background in criminal law. She has been a criminal attorney for -- dedicated solely to criminal practice. She is not sidelining in personal injury or doing anything else. She has been in two D.A.'s offices. So she understands the way the D.A.'s work. She's done a number of jury trials, 24 jury trials, which is a lot. It appears to the Court that she has attempted to communicate with you, has visited with you more times in six months than the Court -- and I've been on the bench for 19 years -- than I see most attorneys visiting their clients in jail. The Court also takes -- is mindful of the fact that she is now the fourth attorney. While I take that you may have communication problems, I don't think that it rises to the level of the Court relieving [trial counsel]. I do believe that the case can go forward, and that [trial counsel] can competently represent you.

> "So, the Marsden is denied."

## B.     Legal Principles

Under *Marsden* and its progeny, when a defendant seeks substitution of appointed counsel, " ' "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing

13.

adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*People v. Ng* (2022) 13 Cal.5th 448, 500.) " 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230, quoting *People v. Hines* (1997) 15 Cal.4th 977, 1025.)

" 'Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge.' " (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.) We review the denial of a defendant's *Marsden* motion for abuse of discretion. (*People v. Ng, supra*, 13 Cal.5th at p. 500.) " 'The court does not abuse its discretion in denying a *Marsden* motion " 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." ' " (*People v. Myles, supra*, 53 Cal.4th at p. 1207.)

### C. Analysis

Rangel contends that the trial court abused its discretion by denying his *Marsden* motion because "[he] and trial counsel were in complete agreement that there had been 'a breakdown in communication.' " Rangel's assertion is belied by the record.

The record demonstrates that the problem was not trial counsel's failure to communicate with Rangel, but rather, Rangel's unwillingness to cede control of trial strategy and tactical decisions to his appointed attorney. Even so, such disagreements do

not, alone, constitute irreconcilable conflict. (See, e.g., *People v. Welch* (1999) 20 Cal.4th 701, 728-729 ["A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and compete defense [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict' "].) Particularly where the defendant is himself the source of the conflict. (See *People v. Taylor* (2010) 48 Cal.4th 574, 600, quoting *People v. Smith* (1993) 6 Cal.4th 684, 696 [" '[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict' "]; *People v. Lindsey* (1978) 84 Cal.App.3d 851, 860 [a breakdown caused by the defendant's intransigence and failure to cooperate is insufficient to support substitution of appointed counsel].)

Furthermore, while both trial counsel and Rangel acknowledged a "breakdown in communication," neither indicated that they could not continue working together. In fact, Rangel expressed his desire to keep working with his appointed attorney, representing that he would "continue to speak up on ... issues when I think there is one." He added, "I want to work with my attorney. I want to bring forward and help her best while I can."

Rangel further contends that in concluding there was no breakdown in communication between himself and his appointed counsel, the trial court improperly focused on counsel's competence as an attorney. Not so. Although the trial court observed that counsel had significant experience in criminal law, it did so in response to Rangel's claim that trial counsel was being too accommodating to the district attorney and in response to Rangel's complaint about trial counsel's decisions related to trial strategy.

For example, trial counsel asserted that she was not going to object to the prosecutor's requests for a continuance, both of which were supported by good cause, just because she could. Doing so would cause her to lose credibility with the court or the

15.

prosecuting attorney. The trial court remarked that trial counsel had an extensive background in criminal law, and "understands the way the D.A.'s work."

We further observe that with respect to Rangel's stated communication problems with trial counsel, the court remarked, "It appears to the Court that [trial counsel] has attempted to communicate with you." The court stated that in its 19 years on the bench, trial counsel had visited Rangel in jail more frequently within the time span of six months than it had seen other attorneys visit their clients throughout the entirety of their representation. Based upon the foregoing, the trial court correctly concluded that Rangel had failed to demonstrate he and his appointed attorney were " ' "embroiled in such an irreconcilable conflict that ineffective representation [was] likely to result." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 857.)

Even assuming error however, the record does not support Rangel's claim of prejudice. We examine the trial court's decision to deny a *Marsden* motion under the beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (See *Marsden, supra*, 2 Cal.3d at p. 126, citing *Chapman*); see also, *People v. Chavez* (1980) 26 Cal.3d 334, 348-349 [*Marsden* does not implicate structural error]; *People v. Loya* (2016) 1 Cal.App.5th 932, 945 [denial of *Marsden* motion reviewable for error under *Chapman*].)

The evidence supporting Rangel's conviction for forcible rape was compelling. Although Rangel denied having sex with V.S., his DNA could not be excluded as the contributor to the sample taken from her vagina. Rangel attempted to explain this by testifying that he had consensually rubbed his penis against V.S.'s vagina. But, even if this were true, his version of events failed to explain why his DNA was found inside of V.S.'s vagina. Nor did Rangel's admission that he had only punched V.S. one time account for the injuries documented to her during her SART examination, including: the bruising on her head, jaw, arm, hand, and thigh, her broken and bent fingernails, and the

redness and swelling of her vagina. Rangel's claim that the sexual encounter was consensual is further undermined by the fact that he initially told Detective Taylor that he did not know V.S. and had never had sexual intercourse with her. Based on the strong evidence of guilt and his comparatively weak defense, we conclude that any error in the trial court's denial of Rangel's third *Marsden* motion was harmless beyond a reasonable doubt.

## II. The Trial Court's Imposition of a Full-Term Consecutive Sentence

Rangel was sentenced to the full term of eight years for his conviction in the instant case, which was imposed consecutive to the six-year term he was already serving for his 2019 robbery conviction. He contends that his sentence is unauthorized because the trial court was required to impose a single aggregate term for both sentences. (See Cal. Rules of Court, rule 4.452(a)(1).) The Attorney General submits that the trial court correctly sentenced Rangel under section 667.6, subdivision (c), which vested the court with discretion to impose a full, separate, and consecutive term for his conviction. The authority upon which the Attorney General relies does not support his assertion.

Rangel's sentence appears to be unauthorized, and is therefore, "reviewable even in the absence of an objection in the trial court." (*People v. Maharaj* (2012) 204 Cal.App.4th 641, 648.) For the reasons discussed below, we will reverse Rangel's sentence and remand the matter back to the lower court for resentencing.

### A. Background

After imposing the aggravated term of eight years for Rangel's conviction in the instant case, the courtroom clerk asked the court a question off the record. The court clarified that the sentence "shall run consecutive to the term imposed and that the defendant is serving in case No. F19904843." In case No. F19904843, Rangel was convicted of robbery in 2019 and sentenced to a six-year prison term. The trial court did not provide any further comments regarding this sentencing decision.

## B.	Legal Principles

If a defendant has been convicted of multiple offenses, the sentencing court has discretion to impose the sentence on each offense concurrently or consecutively, unless another statute mandates imposition of consecutive terms.  (§ 669, subd. (a); *People v. Jones* (1988) 46 Cal.3d 585, 592 ["[s]ection 669 authorizes the court to decide whether sentences should run concurrently or consecutively"].)

If a court makes multiple terms concurrent, they must all be full terms.  (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1156, fn. 3, overruled on other ground in *People v. Poisson* (2016) 246 Cal.App.4th 121, 125.)  If it makes multiple terms consecutive, section 1170.1 governs calculation of their length unless a more specific statute applies.  (*People v. Sasser* (2015) 61 Cal.4th 1, 8-9.)  Under section 1170.1, "the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for [certain] enhancements ...."  (§ 1170.1, subd. (a).)  Enhancements aside, the principal term is the longest term imposed for any of the offenses, while the subordinate term comprises one third of the middle term for each other conviction at issue.  (*Ibid.*)  Thus, the minimum term on a second or subsequent felony conviction subject to section 1170.1 is one third of the middle term, unless a more specific statute applies.  (See *People v. Baker* (2022) 144 Cal.App.4th 1320, 1328-1329 ["when a defendant is sentenced consecutively for multiple convictions occurring in different proceedings, the second court designates the longest term as the principal term, and any other consecutive term is considered a subordinate term, for which the sentence can be no more than one-third the midterm for the offense"].)

Section 667.6 provides for an alternative, more severe sentencing scheme when the defendant has been convicted of specified sex crimes.  If a defendant is convicted of one or more offenses listed in section 667.6, subdivision (e), such as forcible rape (see § 667.6, subd. (e)(1)), the sentencing court in some circumstances may exercise

discretion to impose, and in some circumstances must impose, a "full, separate, and consecutive term" for each such offense. (§ 667.6, subds. (c)-(d).)[4]

If "the crimes involve the same victim on the same occasion," then "a full, separate, and consecutive term *may* be imposed" for each "[i]n lieu of the term provided in Section 1170.1" (§ 667.6, subd. (c), italics added). As the term "may" implies, if the crimes involve the same victim and same occasion, the court may decline to impose full consecutive terms under section 667.6, subdivision (c) and instead impose terms dictated by the default rules of sections 669 and 1170.1—i.e., either full, concurrent terms or consecutive terms consisting of one full upper, middle, or lower term and one third the middle term on each other count.

### C.    Analysis

Section 667.6, subdivision (c), which allows for a full, separate, and consecutive sentence, provides as pertinent, "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) [of section 667.6] *if the crimes involve the same victim on the same occasion.* A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e)."[5]  (Italics added.)

---

[4]  Section 667.6, subdivision (d)'s mandatory sentencing provisions are inapplicable to the instant case. We therefore do not discuss it.

[5]  Section 667.6, subdivision (c) states in its entirety:

> "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion. A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e). If the term is imposed consecutively pursuant to this subdivision, it shall be served consecutively to any other term of imprisonment, and shall commence from the time the person otherwise would have been released from imprisonment. The term shall not be included in any determination pursuant to Section 1170.1. Any other term imposed subsequent to that term shall not be merged therein but shall

19.

Forcible rape (§ 261, subd. (a)(2)) is a violent sex crime within the meaning of subdivision (e) of section 667.6. (See § 667.6, subd. (e)(1).) However, nothing upon the instant record suggests that Rangel's 2019 conviction for robbery and his conviction for forcible rape "involve the same victim on the same occasion." (§ 667.6, subd. (c).) Thus, it is unclear how section 667.6's discretionary sentencing provisions could have applied under the circumstances.

*People v. Goodliffe* (2009) 177 Cal.App.4th 723 is helpful. The defendant there, Goodliffe, was convicted of committing a forcible lewd act upon a child, which is an offense specified in subdivision (e) of section 667.6. (See § 667.6, subd. (e)(5).) Goodliffe was also convicted of nonforcible molestations of the same victim, which occurred on a separate occasion. (*People v. Goodliffe*, at pp. 725-726.) The Attorney General conceded that "the other crimes of which [Goodliffe] was convicted did not involve the same victim on the same occasion." (*Id.* at pp. 725-726, italics added.) As the appellate court explained, Goodliffe was therefore "not subject to subdivision (c)[, of section 667.6] because the other crimes of which he was convicted did not involve *the same victim on the same occasion*." (*Id.* at p. 726.)

Here, Rangel's convictions were not shown to have been committed on the same occasion, much less against the same victim. Consequently, the trial court did not have the discretion to sentence him to the full consecutive term under section 667.6, subdivision (c). In arguing otherwise, Rangel directs this court to *People v. Pelayo* (1999) 69 Cal.App.4th 115, 123. However, *People v. Pelayo* was published prior to legislative amendments to section 667.6 which repealed statutory language authorizing the court to "impose 'a full, separate, and consecutive term ... for each violation of [enumerated sex offenses] whether or not the crimes were committed during a single

---

commence at the time the person otherwise would have been released from prison."

transaction.' (Former § 667.6, subd. (c), as amended by Stats. 2002, ch. 787, § 16.)" (*People v. Goodliffe*, *supra*, 177 Cal.App.4th at p. 728, italics omitted from original.) Thus, *People v. Pelayo* is not instructive.

The record does not show what sentencing scheme the trial court sentenced Rangel under when it imposed his eight-year prison term for rape fully consecutive to his prior conviction for robbery. And, other than section 667.6, subdivision (c)'s discretionary provisions, the Attorney General does not suggest another sentencing scheme that may have supported the sentence imposed. We will therefore remand the matter back to the lower court for resentencing. (See § 1170, subd. (c) ["The court shall state the reasons for its sentence choice on the record at the time of sentencing"].)

## III. The Trial Court's Instruction on the "Violent Conduct" Factor in Aggravation

One of the aggravating circumstances enumerated under the California Rules of Court, rule 4.421 includes the fact that "[t]he defendant has engaged in violent conduct that indicates a serious danger to society." (*Id*., rule 4.421(b)(1).) With respect to this factor, newly released CALCRIM No. 3234 further provides: "You may not find the allegation true unless all of you agree that the People have proved that the defendant's violent conduct was distinctively worse than that posed by an ordinary commission of the underlying crime and that the violent conduct, considered in light of all the evidence presented [and the defendant's background], shows that the defendant is a serious danger to society." (CALCRIM No. 3234.) CALCRIM No. 3234 was available at the time of Rangel's trial, but it was not given in his case.

Rangel asserts that the trial court committed prejudicial instructional error by failing to instruct the jury that to find that "[he] has engaged in violent conduct that indicates a serious danger to society," within the meaning of rule 4.421, the jury had to find that his conduct was "distinctively worse" than the ordinary commission of the

21.

offense. We conclude that Rangel has failed to demonstrate prejudicial error from the omission of this language from the jury instructions.

**A.      Background**

The jury was instructed on California Rules of Court, rule 4.421(a)(1) as follows:

> "The People further allege that the defendant in the commission of the crimes for which he may be found guilty engaged in a violent conduct, which indicates that he represents a serious danger to society. You must determine if this allegation is true beyond a reasonable doubt.

> "A serious danger to society means an unreasonable risk that the defendant will commit a new violent felony. In determining whether the People have proven the defendant's conduct in the commission of the crimes for which he or she may be found guilty indicates a serious danger to society, then you may consider the following: The defendant's criminal history and the extent of the injury to the victim, the remoteness of the crime, and the defendant's criminal history.

> "Now, the People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

In March 2023, prior to the commencement of Rangel's trial, a pattern jury instruction for the "violent conduct" aggravating factor, was released. (See Cal. Rules of Court, rule 4.421.) The instruction, CALCRIM No. 3234, provides the following, in relevant part:

> "[The People have alleged that <insert name of defendant> has engaged in violent conduct, to wit: <insert description of conduct>, which indicates (he/she) is a serious danger to society.]

> "To prove this allegation, the People must prove that:

> "1. The defendant has engaged in violent conduct;

> "AND

> "2. The violent conduct, considered in light of all the evidence presented [and the defendant's background], shows that the defendant is a serious danger to society.

"[To determine whether the defendant is a serious danger to society, you may consider the defendant's conduct before or after commission of the crime [as well as evidence about the defendant's background].]

"You may not find the allegation true unless all of you agree that the People have proved that the defendant engaged in violent conduct that shows (he/she) is a serious danger to society. However, all of you do not need to agree on which violent conduct shows that the defendant is a serious danger to society.

*"You may not find the allegation true unless all of you agree that the People have proved that the defendant's violent conduct was distinctively worse than that posed by an ordinary commission of the underlying crime* and that the violent conduct, considered in light of all the evidence presented [and the defendant's background], shows that the defendant is a serious danger to society.

"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

Although CALCRIM No. 3234 was only recently released, the "distinctively worse" language in the pattern instruction is based on case law dating back to 1982. (Cf. to CALCRIM No. 3234, citing *People v. Moreno* (1982) 128 Cal.App.3d 103, 110 ["The essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary"].)

## B.    Legal Principles

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We must review the wording of the jury instruction and assess whether it accurately states the law. (*Ibid.*) We must consider whether a reasonable likelihood exists that the challenged instruction "caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*) "There is no error in a trial court's failing or refusing to instruct on one matter,

23.

unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.)

## C. Analysis

Rangel contends that the trial court erred by failing to instruct the jury that "[a]n aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.' " (*People v. Black* (2007) 41 Cal.4th 799, 817, quoting *People v. Moreno, supra,* 128 Cal.App.3d at p. 110; see *People v.* Scott (1994) 9 Cal.4th 331, 350 ["the court generally cannot use a single fact both to aggravate the base term and to impose an enhancement, nor may it use a fact constituting an element of the offense either to aggravate or to enhance a sentence"]; Cal. Rules of Court, rule 4.420(h) ["A fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term."].)

Newly released CALCRIM No. 3234 [Aggravating Factor: Serious Danger to Society], provides the following: "You may not find the allegation true unless all of you agree that the People have proved that the defendant's violent conduct was distinctively worse than that posed by an ordinary commission of the underlying crime and that the violent conduct, considered in light of all of the evidence presented [and the defendant's background], shows that the defendant is a serious danger to society." The case authority upon which this statement is derived has existed since 1982. (See *People v. Moreno, supra*, 128 Cal.App.3d at p. 110.) Nonetheless, we will presume that Rangel did not forfeit his claim that the trial court erred by failing to instruct the jury on this point, sua sponte.

We are persuaded that any presumed error from the trial court's failure to instruct the jury with the "distinctively worse" language, sua sponte, was harmless. Rangel's

24.

claim of prejudice is premised upon his assertion that the jury instructions omitted an element of the offense, thereby implicating the heightened test for harmlessness under *Chapman*. However, Rangel has not directed this court to any authority which supports his assertion that the trial court had a sua sponte duty to instruct on the "distinctively worse" language, despite its availability at the time of his trial.

Further, although Rangel argues that the omission of this "element" was an error in violation of the federal Constitution, the commentary to CALCRIM No. 3234 explains that this is a state law requirement. (See Comm. CALCRIM No. 3234 ["the committee has elected to include in the instruction *the state law requirement* that an aggravating factor may not be found to be true unless the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime"], italics added.) The error here, if any, was a state law instructional error, implicating *Watson's* test for harmless error. (See *People v. Hendrix* (2022) 13 Cal.5th 933, 942, quoting *People v. Beltran* (2013) 56 Cal.4th 935 [explaining that *Watson* "applies to ' " ' "incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error" ' " ' "]; see also, *People v. Epps* (2001) 25 Cal.4th 19, 29 [errors of state law ordinarily proceed under *Watson* test]; and *People v. Blackburn* (2015) 61 Cal.4th 1113, 1133-1135 [absent exceptional cases, *Watson* test applies to state law errors].)

Under *Watson*, reversal is not warranted unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) " ' " '[A] "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " ' " (*People v. Hendrix*, *supra*, 13 Cal.5th at p. 944, quoting *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.) We conclude that upon this record, there is no more than an abstract possibility that Rangel would have received a

more favorable outcome had the jury been instructed pursuant to the "distinctively worse" language in CALCRIM No. 3234.

To accomplish rape by force, the defendant must use enough physical force to overcome the victim's will. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024; see also, CALCRIM No. 1000.) Here, the record discloses substantial evidence of the fact that Rangel committed the forcible rape against V.S. in a manner that was distinctively worse than the ordinary commission of this offense.

V.S. testified that on the night of the incident, Rangel punched her and pushed her inside of a spare bedroom, causing her forehead to strike the wall. Rangel then attempted to forcibly remove V.S.'s pants. When she resisted, Rangel punched V.S. in her jaw, causing her to temporarily lose consciousness.

When she regained consciousness, her pants had been removed. V.S. pleaded with Rangel to stop, but he punched her again, causing her to lose consciousness once more. She awoke to find Rangel attempting to penetrate her anally, and then penetrating her vaginally. After ejaculating, Rangel threatened to beat V.S. if she left the room. As a result of the attack, V.S. suffered multiple injuries, including: a bruise on the left side of her head, bruising and tenderness on her jaw, a broken and a bent fingernail, and bruises on her arm, hand, and thigh. The SART examination further revealed that V.S.'s vagina was red and swollen. Based upon the evidence adduced at trial, we conclude that it is not reasonably probable that Rangel would have received a more favorable outcome had the "distinctively worse" language from CALCRIM No. 3234 been given to the jury.

IV.    **The Trial Court's Consideration of Rangel's Felony Convictions for Robbery**

Rangel maintains that the trial court prejudicially erred when, in imposing the aggravated term of eight years, the trial court found that he had suffered "prior" convictions for robbery, even though the robberies were committed after the forcible rape

26.

for which he was convicted in the instant case. The record does not support Rangel's claim of prejudicial error.

## A.    Background

During trial, counsel informed the trial court that Rangel had suffered two felony convictions for robbery, both of which occurred after the forcible rape charged in the instant case.[6] When the trial court later determined that it could consider the robbery convictions for sentencing purposes, trial counsel objected. The trial court stated:

> "[THE COURT]: … Rule of Court 4.420(c) not only doesn't require me to send aggravating factors relating to the prior convictions to the jury, but it in fact carves out an exception where based on the evidence that's been presented, the Court can and in fact should just take under consideration those convictions as aggravating factors on its own. So we have crafted special instructions to just address the aggravating factors that can go to the jury. They are aggravating factors under 4.421 relating to the defendant, not to the crime or, excuse me, no, that's not right."

Trial counsel stated her objection for the record. In response, the trial court stated that it would consider the matter again at Rangel's sentencing hearing.

During his trial testimony, the prosecution confronted Rangel with his two robbery convictions. The prosecutor also admitted into evidence a section 969b packet, documenting Rangel's convictions.

At Rangel's sentencing hearing, the trial court made the following comments, in relevant part:

> "[THE COURT]: Now, within the sentencing schemes as the statutes now set forth, the Court recognizes that sentencing discretion is presumptively limited pursuant to 1170(b)(1), essentially, precluding the imposition of a term above the midterm within the triad, with exceptions being defined in 1170(b)(6) where the Court finds that aggravating factors outweigh the mitigating circumstances, such that the imposition of a lower term would be contrary to the interest of justice. And having reviewed this

---

[6] Rangel suffered a 2016 conviction for robbery (case No. F16901330), and in 2019 he was convicted of another robbery (case No. F19904843).

and having heard the evidence in the case, having seen the jury's verdicts, in which they clearly discern that one allegation of criminal conduct was true and another was not, the Court does at this time find that the aggravating factors found true by the jury *along with the prison convictions found true by the Court, that these aggravating factors do outweigh the mitigating circumstances, so that to impose the lower term would be contrary to the interest of justice*.

[¶] …[¶]

"In further consideration of the interest of justice in choosing the appropriate term within the triad, the Court is required to make an individualized review of the interest of justice, in terms of constitutional rights of the defendant as opposed to the interest of society as represented by the People as well as the defendant's background and the prospects, that is, the defendant's record, the nature of the crime -- the nature of the crimes, the defendant's involvement in the crimes as well as the aggravating and mitigating factors per the Rules of Court, which I've already reviewed. It's also given that I must consider the mitigating factors under 1170(b)(6), which I have, and I've stated. And the statute also provides that I could consider any factors that would be considered by a reasonable judge.

[¶] …[¶]

"The Court, therefore, is denying probation. And based on the, what I consider very aggravating circumstances of the attack on the victim in this case, the extent of the physical injuries to the victim, both physical and emotional, the specific findings of aggravation by the jury in this case, and *I would just say at this point that the defendant's criminal history is something that the Court is, for purposes of this sentencing, really setting aside. I'm not going to try to attribute crimes that he committed after this event to his circumstances at the time that this…crime occurred. But it is, I think, an overall indication of what the community and society is going to be led to expect from the defendant down the road*.

"The Court, therefore, is denying probation. And based on all the considerations I've just articulated, I am deciding that the appropriate term is the aggravated term of eight years to be served in the Department of Corrections." (Italics added.)

## B. Analysis

Rangel correctly observes that his robbery convictions, which occurred after his commitment offense, do not qualify as "prior" convictions within the meaning of California Rules of Court, rule 4.421(b)(2) and 4.421(b)(3). (See *People v. Gonzales* (1989) 208 Cal.App.3d 1170, 1172 ["prior" convictions and prison terms referred to in Cal. Rules of Court, rules 421(b)(2), 421(b)(3) (now rules 4.421(b)(2), 4.421(b)(3)) are limited to those occurring *prior to* the currently charged offense].) However, convictions resulting from subsequent conduct may be considered as an aggravating factor. (See *People v. Gonzales*, at pp. 1171-1172.)

To that end, while the trial court erroneously referred to Rangel's convictions for robbery as prior convictions, it considered Rangel's convictions for subsequent conduct in the specific context of factors "which reasonably relate to the defendant …." (Cal. Rules of Court, rule 4.421(c).) "Neither section 1170 nor the California Rules of Court attempt to provide an inclusive list of aggravating circumstances. Thus, a trial court is free to base an upper term sentence upon any aggravating circumstance that (1) the court deems significant and (2) is reasonably related to the decision being made." (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196; see Cal. Rules of Court, rule 4.421(c) [besides the enumerated circumstances in aggravation, a court may rely on "[a]ny other factors statutorily declared to be circumstances in aggravation or which reasonably relate to the defendant or the circumstances under which the crime was committed"].)

Rangel contends that he had the right to a jury trial on this aggravating factor. However, the trial court found that Rangel's convictions for robbery were relevant for purposes of rebutting the low term presumption under section 1170, subdivision (b)(6), and not for imposing the aggravated sentence.

Unlike subdivision (b)(1) and (b)(2) of section 1170, the provisions that govern imposition of an aggravated prison term, there is no "beyond a reasonable doubt finding"

29.

requirement under subdivision (b)(6) of section 1170. (See *People v. Hilburn* (2023) 93 Cal.App.5th 189, 204 [finding that imposition of the middle term sentence where the section 1170, subdivision (b)(6) low term presumption applies, does not implicate *Apprendi*[7]]; see also, *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 929 [concluding that section 1170, subd. (b)(6) does not require aggravating circumstances to be proven to jury beyond a reasonable doubt and declining "to import [the subdivision (b)(1) and (b)(2)] requirement into section 1170, subd. (b)(6) as a prerequisite to imposing of the middle term"]; Cal. Rules of Court, rule 4.420(d) ["[i]n selecting between the middle and lower terms of imprisonment, the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision. The court may consider factors in aggravation and mitigation, whether or not the factors have been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial"].)

With respect to the trial court's decision to impose the aggravated term, the trial court did not consider Rangel's robbery convictions for this purpose. The trial court stated that it was setting Rangel's other convictions aside for purposes of sentencing, explaining: "I would just say at this point that the defendant's criminal history is something that the Court is, for purposes of this sentencing, really setting aside. I'm not going to try to attribute crimes that he committed after this event to his circumstances at the time that this…crime occurred. But it is, I think, an overall indication of what the community and society is going to be led to expect from the defendant down the road." (Italics added.) Consequently, even assuming Rangel's subsequent convictions for

---

[7] *Apprendi v. New Jersey* (2000) 530 U.S. 466.

robbery were subject to a "beyond a reasonable doubt" finding requirement, we find no prejudice upon this record.[8]

## V.    Imposition of the $300 Restitution

Finally, Rangel contends that the trial court abused its discretion by imposing the $300 minimum restitution fine pursuant to section 1202.4.  According to Rangel, the trial court was unaware that it had the discretion to stay the fine, or not to impose it at all. Assuming error, we conclude that Rangel forfeited his claim.

### A.    Background

At sentencing, Rangel asked the trial court to waive the $2,400 in fines and only impose the "statutory minimum of [$]300."  Trial counsel explained, "We're going to be requesting three years, and to make up $2400 within -- to make up $2400 within that time, probably making seven cents an hour, if he works, it's just a lot."  The trial court imposed, as Rangel had requested, "only the statutory minimum [fine] of $300 pursuant to [section] 1202.4" and waived all other non-mandatory fines and fees.  The trial court explained that its reason for doing so was based on "statements of counsel and common sense, [that] the defendant has a limited ability to pay restitution fines."

### B.    Forfeiture

Rangel contends that the trial court erred by imposing the $300 minimum restitution fine, rather than staying imposition of the fine or declining to impose it at all. *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the authority upon which Rangel primarily relies to support his claim, was decided four-and-a-half years prior to Rangel's sentencing hearing.  Moreover, the trial court imposed a $300 minimum restitution fine at

---

[8] In his fifth claim on appeal, Rangel submits that the cumulative error from the trial court's failure to instruct the jury with the "distinctively worse" language in CALCRIM No. 3234, in addition to the trial court's consideration of Rangel's robbery convictions at sentencing violated his right to due process and a fair trial under the federal Constitution.  Because we find no error from the trial court's consideration of Rangel's subsequent convictions for robbery, there is no cumulative prejudice.

trial counsel's request.  Under the circumstances, any presumed error in the trial court's imposition of the $300 minimum restitution fine was not only forfeited, it was invited by trial counsel.  (See *Jentick v. Pacific Gas & Electric Co.* (1941) 18 Cal.2d 117, 121 ["Under the doctrine of 'invited error' a party cannot successfully take advantage of error committed by the court at his request"].)  We therefore do not reach the merits of Rangel's claim.

Nonetheless, in light of our conclusion in part II, *ante*, finding that a resentencing hearing is required, trial counsel may raise this issue at Rangel's resentencing hearing.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)[9]

## DISPOSITION

The sentence is reversed and the cause is remanded for resentencing.  In all other respects, the judgment is affirmed.

SMITH, Acting P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.

---

[9]    On August 12, 2024, appellant's counsel submitted a letter notifying this court of the following new authority:  *Erlinger v. United States* (2024) 144 S. Ct. 1840 and *People v. Lynch* (2024) 16 Cal.5th 730.  We have considered these cases, but we do not find that either supports reversal of Rangel's sentence.  In light of our conclusion in part II.C, *ante*, that resentencing is nonetheless required, trial counsel may address the relevance of these cases at Rangel's resentencing hearing.